**RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,**

v.

**UNITED STATES RAILROAD
RETIREMENT BOARD,
Respondent.**

**No. 84–1048.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 30, 1984.

Decided Dec. 5, 1984.

Daniel Joseph, Washington, D.C., with whom David A. Holzworth, Washington, D.C., was on brief, for Government of Canada, amicus curiae, urging reversal of the decision of the Railroad Retirement Bd.

Clinton J. Miller, III, Washington, D.C., with whom William G. Mahoney, Washington, D.C., was on brief, for petitioner.

Thomas W. Sadler, General Atty., Railroad Retirement Bd., Chicago, Ill., with whom Edward S. Hintzke, Asst. Gen. Counsel, Railroad Retirement Bd., Chicago, Ill., was on brief, for respondent.

Before WILKEY, WALD and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Railway Labor Executives' Association ("RLEA") seeks review, pursuant to 45 U.S.C. §§ 231g and 355(f), of a decision of the Railroad Retirement Board ("the Board") which determined that Canadian employees of United States railroads operating in Canada ceased to be covered by the Railroad Retirement Act of 1974 ("RRA"), 45 U.S.C. §§ 231–231t, and the Railroad Unemployment Insurance Act ("RUIA"), 45 U.S.C. §§ 351–367, as of April 10, 1978, the effective date of certain Canadian immigration regulations. The issue on review is whether the Board properly construed the Canadian Immigration Act, 1976 2d Sess., ch. 52, § 10, and the 1978 regulations issued thereunder, as *requiring* United States railroads operating in Canada to employ, *in whole or in part,* Canadian citizens or residents, so as to bring such workers within the exceptions to covered service found in section 231(d)(3) of the RRA and section 351(e) of the RUIA.

We find that the Board's decision lacked any coherent articulation of what types of foreign law restrictions on hiring are sufficient to satisfy the requirement language found in sections 231(d)(3) and 351(e) and consequently lacked any reasoned analysis of why these Canadian regulations come within the meaning of these two sections. We also find that the record on which the Board acted is inadequate to support its apparent conclusion concerning the actual effects of the Canadian law and regulations. We vacate the Board's decision and remand for further proceedings.

## I. BACKGROUND

Together the RRA and RUIA provide a system of retirement and unemployment benefits for railroad workers. Both Acts define an employee as an individual in the service of an employer for compensation or an employee representative. 45 U.S.C. §§ 231(b)(1), 351(d). An individual in the service of an employer is covered under the Acts whether the service is performed inside or outside the United States. 45 U.S.C. §§ 231(d)(1), 351(e). Both Acts, however, contain the following exception to covered service:

> [A]n individual not a citizen or resident of the United States shall not be deemed to be in the service of an employer when rendering service outside the United States to an employer who is *required under the laws applicable in the place where the service is rendered to employ therein, in whole or in part, citizens or residents thereof.*

45 U.S.C. §§ 231(d)(3), 351(e) (emphasis added). It is this exception, contained in both Acts, that is at the heart of the controversy. The Board asserts that Canadian immigration regulations *require* United States railroads operating in Canada to employ Canadians. Consequently, the Canadian employees are excepted from coverage under RRA and RUIA by virtue of sections 231(d)(3) and 351(e), respectively. The RLEA asserts that the Canadian regulations in question *do not require* the rail-

roads to hire Canadians, hence the exceptions to covered service do not apply.

The Canadian Immigration Act provides that any noncitizen or nonresident of Canada seeking to enter Canada for the purpose of engaging in employment must obtain an employment authorization prior to appearing at a port of entry.[1] Immigration Act, 1976 2d Sess., ch. 52, § 10. Regulations issued by the Canadian Minister of Employment and Immigration pursuant to the Immigration Act, 1976 2d Sess., ch. 52, § 115(1)(j), establish the guidelines for the issuance of employment authorizations. See 112 Can.Gaz., Part II, No. 5, §§ 18–20 (March 8, 1978). Section 20 of the regulations provides in relevant part:

(1) An immigration officer shall not issue an employment authorization to a person if,

(a) *in his opinion,* employment of the person in Canada will adversely affect employment opportunities for Canadian citizens or permanent residents in Canada;

. . . .

(3) *In order to form an opinion for the purposes of paragraph (1)(a), an immigration officer shall consider*

(a) whether the prospective employer has made reasonable efforts to hire or train Canadian citizens or permanent residents for the employment with respect to which an employment authorization is sought;

(b) the qualifications of the applicant for the employment for which the employment authorization is sought; and

(c) whether the wages and working conditions offered are sufficient to attract and retain in employment Canadian citizens or permanent residents.

(4) For the purpose of considering the question set out in paragraphs (3)(a) and (c), an immigration officer shall consult an officer of the National Employment Service serving the area in which the person seeking an authorization wishes to engage in employment.[2]

*Id.* at § 20 (emphasis added).

On the basis of the above provisions of the Canadian Immigration Act, and regulations issued thereunder, the General Counsel of the Railroad Retirement Board issued Legal Opinion L–83–79,[3] on March 25, 1983, stating:

I am of the opinion that this statute constitutes a law requiring the employment of Canadian citizens or permanent residents "in whole or in part" for railroad operations in Canada. Consequently, for [sic] months after April 9, 1978, service in Canada by Canadian citizens and permanent residents of Canada employed by United States railroads operating in Canada is not covered under the Railroad Retirement Act and the Railroad Unemployment Insurance Act by virtue of sections 1(d)(3) of the Railroad Retirement Act and 1(e) of the Railroad Unemployment Insurance Act.

---

1. The regulations issued pursuant to the Immigration Act specifically state that within certain exceptions "no person, other than a Canadian citizen or permanent resident, shall engage or continue in employment in Canada without a valid and subsisting employment authorization." 112 Can.Gaz., Part II, No. 5, § 18(1) (March 8, 1978).

2. This is the initial wording of § 20(4) relied upon by the General Counsel in Legal Opinion L–83–79. *See* Petitioner's Appendix at 8 (Petitioner's Appendix is comprised of the certified administrative record in this case.) [hereinafter cited as Appendix]. This section was amended to read:

(4) Where an immigration officer considers the questions set out in paragraphs (3)(a) and

(c), he shall take into consideration the opinion of an officer of the office of the National Employment Service serving the area in which the person seeking an employment authorization wishes to engage in employment. 112 Can.Gaz., Part II, No. 5, § 20(4).

3. The Board is given authority under both RRA and RUIA to determine which employers and employees are covered. *See* 45 U.S.C. §§ 231f(b), 355(b), 355(c) & 362(*l*). At the time L–83–79 issued, the Board's General Counsel was vested with the authority to make initial determinations as to employer and employee status. 20 C.F.R. § 259.1. This regulation has since been amended to vest such authority in the Board's Deputy General Counsel.

Appendix at 8.[4] The General Counsel further stated that this determination would apply prospectively from January 1, 1983.[5] On May 11, 1983, the General Counsel issued Legal Opinion L–83–79.1 making Legal Opinion L–83–79 also applicable to elected railway labor organization officials who are Canadian.[6]

On June 3, 1983, the RLEA sought reconsideration of the Board's decision pursuant to 20 C.F.R. § 259.3. In its request for reconsideration, the RLEA argued that the Canadian immigration regulations do not on their face require the hiring of Canadians or even the denial of an employment authorization to any person, but merely delineate criteria for immigration officers to use in exercising their discretion as to whether an employment authorization should be issued in a specific instance. Appendix at 13–14. The RLEA included in its request for reconsideration a memorandum of law written by a Canadian attorney, Mr. M.W. Wright, Q.C., stating that the regulations create a "preference" for hiring Canadians but do not make the hiring of Canadians "obligatory." Appendix at 20–28.

On December 12, 1983, the Deputy General Counsel issued Legal Opinion L–83–79.2 denying the RLEA's request for reconsideration but permitting the RLEA request to be considered an appeal to the three-member Board pursuant to 20 C.F.R. § 259.5. Appendix at 30–35. The Board affirmed the Deputy General Counsel's decision and denied the RLEA's appeal on January 10, 1984, with one member dissenting. Appendix at 2–4.

## II. DISCUSSION

The Board frames the issue in this case as: "[W]hether the Board's interpretation of the RRA and the RUIA, the statutes which it administers, as they are affected by Canadian law and regulations and Canada's application of them to United States companies, has a reasonable basis in law." Brief for Board at 10. The RLEA, on the other hand, argues that the Board's decision was based upon a determination of foreign law and as such is entitled to no

---

**4.** The General Counsel stated the reasoning supporting this conclusion as follows:

> Thus, it appears that under provisions of the Immigration Act, a United States railroad operating in Canada is required to hire Canadians for any maintenance of way, repair or switching work, as train crew for any non-international operation, as clerical staff, and for most sales and managerial positions, unless the railroad is able to demonstrate that (1) no qualified Canadian citizen or permanent resident was available for the employment involved, and (2) the railroad had made "reasonable efforts" to hire or train Canadian citizens or permanent residents for the employment involved.

Appendix at 8.

**5.** On April 26, 1983, the Board amended its decision to apply retroactively to the period between April 9, 1978, and December 31, 1982, unless the employer notified the Board within 60 days that the employer would make no attempt to recover taxes paid during that period. Appendix at 10. On June 29, 1983, the Board again amended its decision to provide that service between April 9, 1978, and December 31, 1982 would be considered covered service unless the individual worker filed for a tax refund for all or part of the period. Any period for which a tax refund is requested will not be a period of covered service. *See* Appendix at 29.

**6.** The RLEA also challenges the appropriateness of the Board's inclusion of Canadian union representatives within its decision claiming that the Canadian regulations relate only to the employment situation. *See* Brief for RLEA at 11. The Board does not address this issue in its brief. The Deputy General Counsel did address this challenge in his denial of the RLEA's request for reconsideration. He conceded that it is doubtful that the Canadian regulations apply to elected union officials, however, he goes on to assert that the exceptions to covered service nonetheless apply. Although somewhat obscure, the Deputy General Counsel's rationale for this assertion appears to be that the union is subject to the restrictions of the Canadian regulations in its hiring of personnel in Canada (*e.g.,* support staff), thus the union, as an employer, is *required in part* to hire Canadians and consequently the exceptions to covered service apply to *all* employees, including union representatives even though they are not specifically covered by the Canadian regulations. *See* Appendix at 33–34. We decline to resolve this issue on the basis of briefing which consisted of only three sentences in the RLEA's brief and no discussion of the relevant statutory text, legislative history, or relevant case law. *See Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983).

deference. The RLEA asserts that the "question involved in the case at bar is a pure question of statutory and regulatory construction of Canadian law in determining the applicability of the exceptions from covered service contained in 45 U.S.C. §§ 231(d)(3), 351(e), [thus] this court should review the matter *de novo.*" Brief for RLEA at 7. We cannot accept the RLEA's contention that the issue in this case is solely an issue of the determination of foreign law. Clearly, what is at issue here is the interplay between the exception to coverage provisions of the RRA and RUIA and Canadian law. Although we basically accept the Board's statement of the issue in this case, that does not bring in its wake an acceptance of the Board's idea of the high level of deference to be accorded its decision.

■ The Board's determination of Canadian law is entitled to no deference from this court. *Bamberger v. Clark,* 390 F.2d 485, 488 (D.C.Cir.1968) (overturning agency's determination of German law). This is purely a question of law and the court is free to make its own independent determination of Canadian law.[7] In the present case, however, we are not being asked to make an isolated determination of foreign law but rather to determine whether the relevant provisions of foreign law come within the meaning of sections 231(d)(3) and 351(e). To make this latter determination, we must first know the meaning of sections 231(d)(3) and 351(e), *i.e.,* the standard or criteria to be used in assessing and evaluating Canadian law.

It is well established that an agency's construction of its own governing statutes is entitled to considerable deference. *Chevron U.S.A., Inc. v. Natural Resources*

*Defense Council,* —— U.S. ——, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court articulated the appropriate framework for analysis:

> If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> ... Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Id.* at 2782 (footnotes omitted). Thus, when an agency formulates standards or policy pursuant to an implicit delegation of authority, *Chevron* directs us to uphold the agency's interpretation of its own governing statute if "reasonable." *Id.*

■ Congress, in the RRA and RUIA, has granted the Board broad authority to exercise the duties and powers necessary to administer and enforce the Acts, including the authority to determine which employees are covered. *See* 45 U.S.C. §§ 231f(b)(1), 362(*l*). Thus the Board has been implicitly delegated the task of elaborating the standard in question. The principal argument advanced by the RLEA, however, is that the plain meaning of the requirement language in §§ 231(d)(3) and 351(e) is controlling, and that no reasonable construction of the Canadian regulations can be deemed to create a requirement in

---

**7.** *See Kalmich v. Bruno,* 553 F.2d 549, 552 (7th Cir.) ("Irrespective of the deference to which a district court judge's determination of the local law is entitled, we regard the matter of foreign country law as purely a 'question of law,' as it is characterized in Rule 44.1, the resolution of which we are free to arrive at on the basis of our own independent research and analysis."), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). *Accord, De Los Santos v. I.N.S.,* 690 F.2d 56, 59 (2d Cir.1982); *United*

*States v. Vetco, Inc.,* 691 F.2d 1281, 1285 (9th Cir.1981). *See generally* Fed.R.Civ.P. 44.1; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2446, at 414–15 (1971). The Court in *Bamberger* notes that courts do in some instances defer to an agency's view of a question of law. The court is referring, however, to the deference owed to an agency construing and applying its own governing statutes. *See* 390 F.2d at 488 & n. 7.

whole or in part to hire Canadians. *See* Brief for RLEA at 8–12. Specifically, the RLEA argues that the word "require," as defined in the dictionary and construed in the case law,[8] connotes the idea of compulsion—an act which is mandatory or compelled. Brief for RLEA at 10. Moreover, the RLEA appears to assert that the terms "in whole or in part" mean a quota or absolute percentage. *See* Brief for RLEA at 12. Given this construction of sections 231(d)(3) and 351(e), the RLEA asserts that the Board made an erroneous determination of Canadian law because the Canadian regulations do not on their face require the hiring of Canadians but merely "set forth criteria for immigration officers to use in making a determination as to whether an employment authorization shall issue in a specific instance." *See* Brief for RLEA at 9.

Although the RLEA's plain meaning argument is plausible and even superficially appealing, we ultimately reject it. The language of sections 231(d)(3) and 351(e) simply does not compel the narrow, literal interpretation advanced by the RLEA. The statutory terms at issue, "required under the laws" and "in whole or in part," do not have one plain meaning in the context of this case, but rather are subject to varying interpretations. For instance "required under the laws" may refer to *express* provisions mandating the hiring of Canadians, or provisions which on their face create such a strong preference so as to *in effect* compel the hiring of Canadians, or provisions which appear facially neutral but, as implemented, operate to compel the hiring of Canadians. Similarly, a requirement "in part" may be interpreted to mean a requirement that an absolute percentage or quota of Canadians must be hired or that Canadians must be hired to fill certain types of jobs.

In sum, the plain words contained in the RRA and RUIA exceptions to covered service do not compel us to adopt any particular meaning. Moreover, nothing in the legislative history of these provisions gives us any clue as to the meaning Congress intended.[9] Finally, this appears to be the first time the Board has been called upon

---

8. The RLEA cites two cases construing the term "require." *United States v. Henricks,* 388 F.2d 677, 679 (7th Cir.1968) (" 'Require' suggests the authority and duty to impose sanctions for noncompliance and is not satisfied by a mere request."); *Mississippi River Fuel Corp. v. Slayton,* 359 F.2d 106, 119 (8th Cir.1966) (" 'Required' implies something mandatory, not something permitted by agreement."). These cases are distinguishable from the present case, however, because the Board is not asserting that the requirement language of the statutes would be met if the Canadian regulations merely *permitted* or *requested* U.S. railroads to hire Canadians.

9. Section 351(e) was added to the RUIA in 1939. Pub.L. No. 76–141, § 1, 53 Stat. 845 (1939). There is a one paragraph explanation of the addition of § 351(e) in H.R.Rep. No. 686, 76th Cong., 1st Sess. 3 (1939). The provision was added to exclude 400 Mexican employees of the Pullman Company employed exclusively in Mexico because "the service is completely divorced from American soil and it would be extremely difficult to make satisfactory arrangements for administering the Unemployment Insurance Act in such places." *Id.*

Section 231(d)(3) was added to the RRA in 1940 by H.R.J.Res. 496, 76th Cong., 3d Sess. (1940). The addition of § 231(d)(3) was also in response to Pullman's employment of Mexicans in Mexico. *See* H.R.Rep. No. 2029, 76th Cong., 3d Sess. 1 (1940). The House Report accompanying the H.R.J.Res. 496 contains only a 3 paragraph letter from the Railroad Retirement Board explaining the need for the amendment. After noting the earlier amendment of the RUIA, the Board's letter reads:

> With reference to the Railroad Retirement and Carriers Taxing Acts [similarly amended by H.R.J.Res. 496], the situation is perhaps even more difficult. The Carriers Taxing Act provides that every employer, as defined therein ... withhold from the pay of each employee a certain income tax. The Republic of Mexico, on the other hand, prohibits any such deductions.
>
> Administration of the Railroad Retirement Act in Mexico would be substantially as difficult as administration of the Railroad Unemployment Insurance Act, and it seems inadvisable to attempt it apart from any consideration having to do with the Carriers Taxing Act.

*Id.* at 1–2.

The major reasons for enacting these exclusionary provisions appear to be difficulties in administering the Acts in a foreign country and the fact that Mexico prohibited any withholding tax, the means by which these programs are partly funded. *See infra* note 12. At the time these provisions were passed, Mexican Law provided:

to interpret these provisions, hence we have no past Board interpretations to consider. Thus, we must defer to the Board's interpretation of its own governing statutes, provided its interpretation has a reasonable basis. *See Itel Corp. v. United States Railroad Retirement Board,* 710 F.2d 1243, 1245 (7th Cir.1983).

■ Our task in determining the reasonableness of the Board's decision is not to interpret the statutes as we think best but only to inquire as to whether the Board's interpretation is " 'sufficiently reasonable' to be accepted by a reviewing court." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Nonetheless, "the thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling." *Id.* at 37, 102 S.Ct. at 44. In the present case, the Board's reasoning is so lacking in thoroughness that we are unable to discern the Board's basic path of analysis and consequently we are unable to determine the reasonableness of the Board's decision.

At a minimum, the Board's path of analysis should have included an articulation of its interpretation of sections 231(d)(3) and 351(e), including the standard to be used in assessing provisions of foreign law, followed by an application of that standard to the relevant provisions of Canadian law, resulting in a final determination.[10] Instead, the Board has given no definitive interpretation of sections 231(d)(3) and 351(e), articulated no coherent standard as to what kinds of foreign law provisions come within the

requirement language of those sections, and thus given no consistently reasoned analysis of how the Canadian regulations qualified under the requirement language of the exceptions.

In the initial opinion issued on March 25, 1983, the General Counsel offered little in the way of reasoned analysis but appeared to be saying that the Canadian regulations on their face require the hiring of Canadians. *See supra* p. 859 & n. 4. The Deputy General Counsel, in denying the RLEA's request for reconsideration, states that to accept the position advanced by the Canadian lawyer, Mr. Wright, in his letter submitted by the RLEA, "one has to give an extremely literal interpretation to the word 'required,' as used in the sections of the Acts under consideration." Appendix at 31. The Deputy General Counsel, however, then proceeds to discuss the Canadian regulations without ever specifying the "appropriate" interpretation of the word "required." The Deputy General Counsel concludes that "the *practical result* of the [Canadian] regulations is to 'require' an employer in Canada to fill most of his positions with Canadians." Appendix at 32 (emphasis added). This language seems to imply that "require" may mean an express statutory provision or a statutory provision which, while not express, in effect has the result of requiring the hiring of local citizens or residents. In short, the Board never articulates a definitive interpretation of the requirement language contained in the coverage exceptions.[11]

Even if the Board could be construed to have articulated an adequate standard for assessing whether provisions of foreign

In any enterprise, regardless of its nature, the employer may not employ less than 90 percent Mexican workers in each of the skilled and unskilled classes, unless, in the case of skilled workers, the proper board of conciliation and arbitration authorizes a temporary reduction of this percentage.

The preceding prohibition is applicable only when the total number of workers exceeds 5; when it does not, the percentage of Mexican workmen shall be 80.

The requirement in this article does not apply to managers, directors, administrators, superintendents, and general heads of enterprises. Appendix at 33.

10. We would also expect the Board's decision to be supported by findings in the record with respect to the meaning and effect of the Canadian regulations, unless the Board were able to predicate its decision solely on the finding that the express language of the Canadian regulations mandated the hiring of Canadians. *See infra* p. 863.

11. In denying the RLEA's request for reconsideration, the Deputy General Counsel does provide some elucidation of the "in whole or in part" language of the statutory provisions. The Deputy Counsel states:

law come within the meaning of the coverage exceptions, we find it difficult to see how a reasonable assessment of Canadian law could be made on the basis of the evidence entered in the record. The only evidence in the record as to the substance or effect of Canadian law is the letter from the Canadian lawyer, Mr. Wright, submitted by the RLEA in its request for reconsideration and the self-serving assertions of Conrail in its request for a private letter ruling from the Internal Revenue Service.[12] A letter to the Board from Canada's Executive Director of Immigration stating that the Board had misconstrued Canadian law was never even entered in the record. *See* Appendix to *Amicus Curiae* Brief for Canada, Tab C. The Board made absolutely no independent attempt to ascertain the meaning or effect of Canadian law.[13] This might be acceptable if the Canadian regulations contained an explicit, expressed requirement that U.S. Railroads hire a specific percentage of Canadians.

> This language appears to be subject to a number of interpretations. First, it may be said that if the laws applicable to the place of service make it mandatory that locals be hired for some types of jobs but place no restrictions on employment for other types of jobs, then the service in question is not covered since the law "in part" requires the hiring of locals. On the other hand, the law of the place of service may require that all employees of an enterprise be locals ("in whole") or that a percentage be locals ("in part").
>
> Finally, it would appear that service is not covered even if the law of the place of service does not make it mandatory that locals be hired (requires "in whole") but merely gives locals a preference in employment (requires "in part"), which preference is of sufficient strength, as here, to require that most persons hired be citizens or residents.
>
> Appendix at 32–33.
>
> The Deputy General Counsel, while enumerating these varying interpretations, fails to indicate explicitly which interpretation is being adopted. The second paragraph would seem to imply that a preference for hiring local citizens or residents may in effect be sufficient to be construed as a requirement in part.

**12.** The Deputy General Counsel discounted Mr. Wright's letter as based on an "extremely literal" interpretation of the requirement language in the RRA and RUIA coverage exceptions. *See supra* p. 862. The Deputy General Counsel, however, places utter confidence in Conrail's assertions that Canadian citizens must be hired to fill most positions. *See* Appendix at 37. The Board argues that Conrail's factual assertions were never challenged during the administrative proceedings. *See* Brief for Board at 19. However, as the RLEA points out, until the issuance of the denial of its request for reconsideration, relying on the Conrail data, the RLEA had no reason to believe that the Deputy General Counsel intended to rely on the factual assertions made by Conrail in its request for a private letter submitted to a separate agency—the Internal Revenue Service. *See* Reply Brief for RLEA at 3–4.

The General Counsel apparently issued Legal Opinion L–83–79 solely on the basis of the fact that the Internal Revenue Service had ruled in a private letter ruling to Conrail that Canadian law required the employment of Canadians within the meaning of § 3231(d) of the Railroad Retirement Tax Act (RRTA), 26 U.S.C. §§ 3201–3233, a provision substantially equivalent to § 231(d)(3) of the RRA and § 351(e) of the RUIA. *See* Brief for Board at 5–6. The Board notes in its brief that the railroad retirement system is funded through an employment tax levied under the RRTA and collected by the Internal Revenue System. Brief for Board at 4. The RRA, RUIA, and RRTA all contain substantially similar definitions of employer and employee, thus for the sake of consistency, determinations implementing these definitions are coordinated between the Board and IRS. *Id.* The Board, however, may not totally abandon its independent responsibility to construe and administer the RRA and RUIA on the basis of the recognized need for coordinating their implementation with the IRS' implementation of the RRTA.

**13.** Canada submitted an *amicus curiae* brief presenting its position on Canadian law along with data suggesting that the new regulations issued in 1978 resulted in no change in hiring patterns. The Board argues that while the pre-1978 Canadian regulations did not require the hiring of Canadians, the 1978 regulations "greatly circumscribed the immigration officer's ability to issue an employment authorization and place affirmative dues on an employer to hire and train," thus, creating a requirement. *See* Brief for Board at 17–18. Canada also notes that other regulations exempt a number of specific types of railway employees from the necessity of obtaining work authorizations. *See Amicus Curiae* Brief for Canada at 13–15. Finally, Canada points out that from November 22, 1979, until June 15, 1981, a waiver provision was in effect which exempted all U.S. railway workers from the work authorization provisions of § 20. *Id.* at 11–12. The Board asserts that the issues and evidence presented by Canada is untimely since this material was not presented to the Board during the administrative proceed-

Given the equivocal language of the regulations, *see supra* p. 858, however, the Board has an obligation to make some further inquiry into the intended nature and effect of the regulations.

### III. CONCLUSION

For the foregoing reasons, we vacate the Board's decision and remand for further proceedings consistent with this opinion.

*Vacated and remanded.*

ings. We note, however, that the Board is required to meet its burden of developing a record to substantiate its position.