**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Petitioner,**

v.

**U.S. RAILROAD RETIREMENT BOARD, Respondent.**

No. 86–1333.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1987.

Decided March 25, 1988.

William Birney, for petitioner. William G. Mahoney and Thomas P. Murphy, Washington, D.C., were on the brief for petitioner.

Karl T. Blank, Gen. Atty., Railroad Retirement Bd., with whom Steven A. Bartholow, Deputy Gen. Counsel and Edward S. Hintzke, Asst. Gen. Counsel, Railroad Retirement Bd., Chicago, Ill., were on the brief for respondent.

Daniel Joseph and David A. Holzworth, Washington, D.C., were on the brief for amicus curiae Government of Canada urging reversal.

Before STARR and BUCKLEY,

Circuit Judges, and McGOWAN,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case is before us a second time. The Railway Labor Executives' Association, a voluntary association which represents organized rail employees in the United States and Canada, once again raises issues pertaining to the impact of two federal statutes on Canadian employees of U.S. railroads operating in Canada. The Railroad Retirement Board (Board) determined that the Railroad Retirement Act of 1974 (RRA), 45 U.S.C. §§ 231–231u (1982 & Supp. III 1985), and the Railroad Unemployment Insurance Act (RUIA), 45 U.S.C. §§ 351–367 (1982 & Supp. III 1985), ceased to cover such employees as of April 10, 1978.[1] On that date, certain Canadian immigration regulations went into effect which, the Board concluded, had the impact of requiring the termination of retirement and unemployment benefits provided for under U.S. law and theretofore enjoyed by Canadian employees. The Association seeks review of the Board's decision.

In our prior visitation to this case, we vacated the Board's decision, *Railway Labor Executives' Ass'n v. United States R.R. Retirement Bd.*, 749 F.2d 856 (D.C. Cir.1984) (*RLEA I*), and remanded for further consideration of the federal and Canadian law issues. Subsequently, the Board issued the decision at issue in this case, adhering to its initial interpretation. The Association now challenges (1) the Board's interpretation of federal and Canadian law, (2) its extension of that interpretation to elected union officials, and (3) its delay in reaching its decision, as having a prejudicial effect on Canadian workers. With

one exception, we uphold the Board's decision.

## I

The RRA and RUIA provide a system of retirement and unemployment benefits for railroad workers. Administered by the Board, the system is funded through an employment tax levied under the Railroad Retirement Tax Act (RRTA), 26 U.S.C. §§ 3201–3233 (1982 & Supp. III 1985), and collected by the Internal Revenue Service.[2] The three federal statutes bearing on our case contain substantially similar definitions of the terms, "employer" and "employee." The statutes generally cover service whether performed inside or outside the United States, *see* 45 U.S.C. §§ 231(d)(1), 351(e), 26 U.S.C. § 3231(d).

All three measures, however, contain an exception, the interpretation of which is at the center of this case. The exception provides:

[A]n individual not a citizen or resident of the United States shall not be deemed to be in the service of an employer when rendering service outside the United States to an employer who is *required* under the laws applicable in the place where the service is rendered to employ therein, *in whole or in part*, citizens or residents thereof.

45 U.S.C. §§ 231(d)(3), 351(e), 26 U.S.C. § 3231(d)(7) (emphasis added).

In response to a request by Conrail, the IRS in January 1983 issued a Private Letter Ruling concluding that, as a result of recent amendments to Canada's immigration laws, the RRTA-mandated exception applied to service rendered in our neighbor to the north. *See* R. at 13–17. In IRS's view, the Canadian Immigration Act, 1976 2d Sess., ch. 52, § 10, and the 1978 regulations promulgated thereunder, constituted a law *requiring* the employment of Canadi-

---

* Senior Circuit Judge McGowan was a member of the panel that heard this case, but did not participate in this decision.

1. *See Appeal of RLEA Re: Canadian Service,* Railroad Retirement Board Decision (May 6, 1986), reprinted in Record on Appeal (R.) at i-xxxix.

2. IRS, as the agency responsible for the general administration of the RRTA, is authorized to determine which employers and employees are covered under that Act. 26 U.S.C. § 7801 (1982).

an citizens or permanent residents *in whole or in part* for railroad operations in Canada.[3] Pursuant to normal inter-agency coordination procedures (and prior to issuing its ruling), the IRS notified the Railroad Retirement Board's General Counsel that it was considering Conrail's request. At that juncture, the General Counsel initiated a review of the status of Conrail's Canadian employees under the RRA and RUIA. To do so, an examination of Canadian law similar to the one the IRS had undertaken was of course required.

The Canadian Immigration Act provides in pertinent part that, prior to appearing at a port of entry, any non-citizen or nonresident of Canada seeking to enter that country for purposes of engaging in employment must obtain an employment authorization. Immigration Act, 1976 2d Sess., ch. 52, § 10. Canada's Minister of Employment and Immigration duly promulgated regulations establishing guidelines for the issuance of employment authorizations. *See* 112 Can.Gaz., Part II, No. 5, §§ 18–20 (March 8, 1978).[4]

In their review, the Board's General Counsel and Deputy General Counsel concluded that the Immigration Act and its implementing regulations (primarily section 20) required American employers in Canada to hire Canadian citizens in whole or in part, and therefore triggered the service exceptions.[5] Their view thus mirrored that of IRS as embodied in its Conrail Private Letter Ruling. On January 10, 1984, the General Counsel based that opinion on his conclusion that for certain job categories United States railroads operating in Canada were required to hire Canadians unless they were able to demonstrate that (1) no qualified Canadian citizen or permanent resident was available for the employment involved, and (2) the railroad had made "reasonable efforts" to hire or train Canadian citizens or permanent residents for the employment involved.

The Association sought reconsideration of the decision and argued that Canadian law does not require the denial of an employment authorization to any person, but merely sets forth criteria to be used in deciding whether to issue an employment authorization. Petitioner presented a memorandum of law, written by a Canadian attorney, M.W. Wright, setting forth the opinion that Canadian law merely articulates a preference for the employment of Canadians.

In December 1983, the Deputy General Counsel denied reconsideration. Legal Opinion L–83–79.2. R. at 28–33. The Deputy General Counsel's opinion stated that, rather than merely creating a preference, Canadian law as a practical matter requires employers to fill most of their positions with Canadians. The opinion explained that the phrase "in whole or in part" in the service exception excepts from covered service situations in which foreign law gives locals a hiring preference of sufficient strength so as to require that most persons hired be locals. L–83–79.2, R. at 29–30.

The opinion also defended the application of the exceptions to elected union representatives. Although the Deputy General Counsel conceded that the Immigration Act and its regulations might not be directly applicable to elected union officials, the opinion stated that union employers would be subject to the hiring restrictions of the Act, and therefore, required in part to hire Canadians. *Id.* at 31–32.

---

**3.** On December 27, 1983, IRS affirmed its Private Letter Ruling in a published Revenue Ruling. Rev.Rul. 83–184, 1983–2 C.B. 173 (1983).

**4.** Section 20 of those regulations provides:
(1) An immigration officer shall not issue an employment authorization to a person if,
(*a*) in his opinion, employment of the person in Canada will adversely affect employment opportunities for Canadian citizens or permanent residents in Canada;

.      .      .      .      .

(3) In order to form an opinion for the purposes of paragraph (1)(*a*), an immigration officer shall consider (*a*) whether the prospective employer has made reasonable efforts to hire or train Canadian citizens or permanent residents for the employment with respect to which an employment authorization is sought;
(*b*) the qualifications of the applicant for the employment for which the employment authorization is sought; and
(*c*) whether the wages and working conditions offered are sufficient to attract and retain in employment Canadian citizens or permanent residents.
(4) Where an immigration officer considers the questions set out in paragraph (3)(a) and (c), he shall take into consideration the opinion of an officer of the office of the National Employment Service serving the area in which the person seeking an authorization wishes to engage in employment.
112 Can.Gaz., Part II, No. 5, § 20 (reprinted in Brief for Amicus Curiae at Appendix C).

**5.** In March 1983, the Board's General Counsel (pursuant to administratively granted authority) issued Legal Opinion L–83–79, stating that he was "of the opinion that [Immigration Act] constitutes a law" satisfying the requirement language of the service exception. R. at 5, 6A. The

Board affirmed the General Counsel's interpretation without discussion.

RLEA appealed from the Board's decision, arguing that the latter's interpretation of *Canadian* law was not entitled to deference and was therefore subject to *de novo* review. *RLEA I*, 749 F.2d at 859, 860. We agreed,[6] but concluded that the issue required a determination "whether the relevant provisions of foreign law come within the meaning of sections 231(d)(3) and 351(e) [of the RRA and RUIA]." *RLEA I*, 749 F.2d at 860. Standards were therefore needed in order to evaluate what brought a foreign law within the service exception. We observed that under the two statutes Congress implicitly delegated to the Board the task of elaborating the necessary standards. Inasmuch as the language of the statute itself did not compel the adoption of a particular meaning (and since the legislative history was inconclusive), we stated that we would be obliged under settled principles to defer to the Board's interpretation, if reasonable, of its governing statute. *RLEA I*, 749 F.2d at 860 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

We concluded, however, that the Board had failed in three respects to set forth a reasonable basis for its interpretation. The Board (1) failed to provide a general definition of what types of foreign legal provisions constitute laws satisfying the requirement language of the exception; (2) failed

to provide a reasoned analysis of why Canadian law satisfied that language; and (3) acted upon a record that was inadequate to support its interpretation of Canadian law. *See RLEA I*, 749 F.2d at 862–64.

## II

Following *RLEA I*, the Board reconsidered its decision and in May 1986 issued the decision now before us.[7] The Board, in effect, stood its ground. After elucidating what it viewed as the governing standards, the Board stated that foreign service is excluded from statutory coverage if the foreign legal provisions (1) expressly mandate that all, or a stipulated percentage or number, of employees be local citizens or residents; (2) mandate that certain occupations, skills, or types of work found in the railroad industry be performed by locals; (3) create a preference for the hiring of locals that imposes such stringent barriers to employment of non-locals that the measures "in effect" require the employer to hire locals; or (4) are *in practice* administered in such a way as to "in effect" require the hiring of locals, regardless of whether they require on their face that locals be hired. To determine whether a foreign law creates a preference or a requirement, the Board stated that it will examine both the wording of the provisions in question and the intention of the foreign government in enacting them. R. at xv–xvi.[8]

---

6.  *RLEA I*, 749 F.2d at 860 (citing *Bamberger v. Clark*, 390 F.2d 485, 488 (D.C.Cir.1968)).

7.  In March 1985, the Board's General Counsel submitted to the Board a draft proposal reversing his prior position in L–83–79. R. at xxxviii–xxxix. The Board rejected the proposal and voted to request the Commissioner of IRS to reexamine his decision in Rev.Rul. 83–184. *See id.*

    In October 1985, RLEA moved for an order directing the Board to comply with this court's mandate in *RLEA I*, claiming that the Board had failed to vacate its order and had unreasonably delayed completing its proceedings. We issued an order requiring the Board to vacate its decision of January 10, 1984, along with Legal Opinions L–83–79 and L–83–79.2, but denying, without prejudice to its renewal, RLEA's claim of unreasonable delay. *Railway Labor Executives'*

*Ass'n v. United States R.R. Retirement Bd.*, No. 84–1048 (D.C.Cir. Nov. 21, 1985).

8.  The Board stated in pertinent part:

    The Board does not consider a foreign law which merely creates a preference for foreign citizens or residents to be a law which requires the hiring of the country's citizens or residents. In other words, if the foreign law simply provides that, other things being equal, a citizen or resident of that country should be employed in preference to a non-citizen or non-resident, the Board would not consider that the exclusion should apply. However, where restrictions are imposed which result in a U.S. citizen or resident not being on an equal footing with the citizen or resident, the degree to which the restrictions create a barrier to employment of U.S. citizens will be considered to determine whether these re-

Applying this interpretation to the pertinent Canadian provisions, the Board concluded that, both on their face and as applied, the regulations implementing the Immigration Act "in effect" require the hiring of locals. *Id.* at xix, xxiv-xxv. The Board based this conclusion on its determination that for an employer to obtain a Canadian employment authorization for a non-local, it "must not only show that [it] made every effort to hire or train a Canadian for the job but also must set up programs so that in the future there will be no need to look for foreigners for employment needs." *Id.* at xxiv. The Board stated that the Canadian regulations not only make it very difficult to hire non-locals, but are "applied in such a way as to make it impossible, eventually, to hire an alien for many, if not all, positions." *Id.* at xxv.

In addition, because unions (as employers) are subject to the Immigration Act and its regulations, the Board concluded that services performed in Canada by (non-local) railroad union representatives are likewise subject to the exception. The Board stated that even if the Immigration Act and its regulations do not apply to *elected* union officials, there is no exception for union support staff. In the Board's view, since a union-employer's hiring practices would in general be subject to the Canadian regulatory regime, the implementing regulations would require the union to employ Canadian locals at least "in part." *Id.* at xxxi. The Board saw no reason to treat elected union officials and union support staff differently.

RLEA challenges the Board's decision on three grounds. It contends that (1) the Board incorrectly interpreted Canadian law as triggering the service exception; (2) even if the Board's construction of the service exception is correct, its extension of the ruling to elected union officials is unreasonable; and (3) the Board delayed unreasonably in reaching a decision, and that to avoid prejudice to Canadian employees, its decision (even if valid) should apply prospectively only.

## A. Interpretation of the Service Exception in the RRA and RUIA.

■ RLEA contends that the service exception was meant to apply only to special—indeed unique—situations that obtained in Mexico and Cuba in the 1930s and 1940s.[9] Moreover, even if the exception were not intended to be so delimited, it was nonetheless meant to be applied only in situations in which foreign law barred the deduction of railroad retirement taxes from the salaries of employees, or otherwise presented formidable administrative impediments to implementation and administration of the RRA and RUIA. RLEA further argues that the decision fails to provide a coherent standard by which foreign legal provisions may be measured.

As we indicated in *RLEA I,* the Board's interpretation of its own organic statutes is reviewed under the now familiar standards articulated in *Chevron* and its progeny. *See NLRB v. United Food & Commercial Workers Union,* —— U.S. ——, 108 S.Ct.

---

strictions in effect *require* the employment of foreign citizens or residents, in whole or in part. In determining whether a law merely creates a preference or, in fact, constitutes a law which *requires* an employer to employ, *in whole* or in part citizens or residents of the country, the Board will look not only to the wording of the foreign law, but also to intention [sic] of the foreign government in enacting the provision. If the intention was to ensure that local citizens and residents would be hired in whole or in part, the Board will consider the law to be a law which requires an employer to employ in whole or in part. R. at xv.

9. The legislative history accompanying the identical bills proposing the service exception amendment to the RUIA indicates that the pro-

vision was added in response to the Pullman Company's employment of Mexicans in Mexico, and a Mexican law that required both that employers hire no less than 90 percent Mexican workers for particular job categories and prohibited employers from withholding funds from employees' paychecks, thus preventing the means by which the RRA and RUIA are funded in part. *See RLEA I,* 749 F.2d at 861 n. 9; H.R.Rep. No. 686, 76th Cong., 1st Sess. 3 (1939).

The Senate Report accompanying the bill identical to the bill that added the service exception to the RRA expressed concern about the administration of that Act not only in Mexico, but in Cuba as well. *See* S.Rep. No. 1572, 76th Cong., 3d Sess. 1 (1940).

413, 98 L.Ed.2d 429 (1987); *INS v. Cardoza–Fonseca,* — U.S. —, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Chevron,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82 (1984). These principles, recently clarified in *United Food Workers,* can be set forth concisely: "[O]n a pure question of statutory construction, our job is to try to determine congressional intent, using 'traditional tools of statutory construction.'" 108 S.Ct. at 421 (citation omitted). If, however, "'the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" 108 S.Ct. at 421 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782).

In *RLEA I,* we indicated that neither the words of the exception nor its legislative history "gives us any clue as to the meaning Congress intended," 749 F.2d at 861; we reached this conclusion after canvassing the pertinent House and Senate Reports.[10] Now, however, both RLEA and the Board argue that a fresh examination of the legislative history antedating enactment of the service exception (and not presented to us in *RLEA I*) supports their respective interpretations.

This "fresh" history is, in the main, made up of correspondence dating from 1938 between the General Counsel of the Pullman Company and the Chairman of the Railroad Retirement Board. This golden-anniversary correspondence concerned how best to handle problems that had arisen in administering the two statutes in countries such as Mexico; however, each proposal either raised new problems or failed adequately to address relevant concerns. The Board therefore opted for a *general* service exception, which was ultimately enacted and became the provision at issue in this case.

The Board argues that these documents, together with language in other pertinent portions of the legislative history, make it clear that Congress deliberately chose general, rather than country-specific language. *See* Brief for Respondent at 11–12; R. at x–xiii.[11] The Association nonetheless, contends that the legislative history shows that Congress intended to address only a very narrow, country-specific problem. In the Association's view, Congress was concerned solely with the "logistical and administrative problems of administering a retirement and unemployment benefits program," Brief for Petitioner at 17, in countries (such as Mexico and Cuba) whose law impeded the funding of benefits programs both by requiring railroads to employ citizens or residents of that country, and by prohibiting the employer from deducting railroad retirement taxes from foreign employees' compensation. *See id.* at 16–25.

As we see it, both sides have somewhat missed the mark in this regard. The newly presented materials help to clarify the nature of the underlying problem, but the materials fail to provide us with a clear expression of Congress' intent on the critical interpretive issue—the breadth of applicability of the covered service exception. The will of Congress in this particular remains clouded. Plainly, the general language of the exception forecloses the Association's preferred reading, but the question remains as to the provision's scope at its outer perimeter. Accordingly, we will defer to the Board's interpretation if it is reasonable. We believe it is, for reasons now to be set forth.

This, we observe preliminarily, should come as no surprise. In *RLEA I,* we specifically stated that the service exception was amenable to varying interpretations.

---

**10.** *See supra* n. 9; *RLEA I,* 749 F.2d at 861 n. 9. The legislative history explains that the major reason for enacting this provision was a perception that in certain countries domestic law would make it extremely difficult to make satisfactory arrangements for the administration of a particular benefits statute, either the RRA or the RUIA. This narrow construction of the statute is, however, in severe tension with its general language.

**11.** Both the House and Senate Reports accompanying the RUIA amendment state that "[a]t present" the only application of the amendatory provision is to about 400 Mexican employees of the Pullman Company. H.R.Rep. No. 686, 76th Cong., 1st Sess. 3 (1939); S.Rep. No. 325, 76th Cong., 1st Sess. 3 (1939). The use of "at present" of course implies that the provisions will have other applications in the future.

*See RLEA I,* 749 F.2d at 861. Our concern with the Board's previous decision was that it failed to articulate which interpretation it was adopting. To be sure, the underlying Legal Opinions reached the conclusion that Canadian law requires employers in Canada to hire Canadians, but those opinions failed to provide a definition of the terms "required" and "in whole or in part." Nor did the opinions articulate a standard against which foreign law would be measured.

In contrast, the decision now before us expressly sets forth the Board's understanding of the pivotal terms "required" and "in whole or in part." It also explains how the Board will analyze foreign laws. Indeed, the Board has crafted a definition of the exception that includes the interpretations we previously suggested were possible. Indicia of reasonableness under *Chevron* therefore abound.

The Association is, of course, of an entirely different view. It asserts that, even if the Board's interpretation is not overly broad, it is unreasonably muddled. The Association argues primarily that the Board incorrectly concluded that *preferences* placing U.S. citizens on an unequal footing with the foreign country's citizens or residents constitute *requirements.* Not so. The Board's decision clearly stated that a foreign law that does not place U.S. citizens and the foreign country's citizens or residents on an equal footing will be treated as a *preference* for hiring foreign locals, *unless* the preference is written or administered so that it "in effect" requires the hiring of the country's citizens or residents in whole or in part. This explana-

tion, we are satisfied, discharged the Board's obligation to adduce a reasonable interpretation.

### B. *Application of the Service Exceptions to Canadian Law.*

█ As we indicated in *RLEA I,* an agency is not entitled to *Chevron* -style deference when it interprets statutes outside its own area of expertise; accordingly, we concluded that our review of the Board's determination of *Canadian law* is *de novo. RLEA I,* 749 F.2d at 860. We observed that we found it "difficult to see how a reasonable assessment of Canadian law could be made on the basis of the evidence entered in the record." *RLEA I,* 749 F.2d at 863. Based upon the scanty record before us at that time, it appeared that (save for the Immigration Act and its regulations) the only evidence considered by the Board was Conrail's presentation in its request for an IRS Private Letter Ruling, and a letter from a Canadian lawyer submitted by the Association.

It appears in contrast that on its second review of the issue the Board considered a much wider range of evidence. The current decision indicates that the Board considered a healthy array of interpretive guides, which we note in the margin.[12]

To support their position as to the meaning of Canadian law, both RLEA and the Government of Canada emphasize that U.S. railroads operating in Canada have succeeded in hiring large numbers of Americans over the past several years. With all respect, however, this argument fails to address the core question raised by the

---

**12.** These were: The Canadian Employment and Immigration Manual; a memorandum concerning the implementation of the Immigration Act and its regulations, written by W.E. McBride, Commissioner (Management) of the Commission of Employment and Immigration Canada, and issued to employer associations; a memorandum submitted by RLEA, and drafted by a Canadian attorney, M.W. Wright; an *amicus* brief written on behalf of the Government of Canada and submitted in *RLEA I*; a letter from D. Cosselin, Director, Canada Immigration Centre, concerning the effect of the Immigration Act and its regulations, on Conrail's hiring practices.

The Board cited Commissioner McBride's directive that before the Commission will authorize the employment of a foreign worker, the employer must provide the Canadian Manpower Center with (1) the full details of the job vacancy; (2) the full details of all activities undertaken by the employer in an effort to hire Canadians for the job in question; and (3) a forecast of the future manpower needs of the employer and the actions the employer plans to undertake to ensure that those future needs will be met from the Canadian labor market. R. at xxiii.

service exceptions—whether Canadian law in effect requires U.S. railroads to hire *even in part*, for *any* position, Canadian citizens and residents. Neither RLEA nor the Canadian Government, as *amicus*, has come forward with evidence that Canadian law does in fact erect such a requirement.

In that respect, the Government of Canada argues that the Board improperly declined to give any weight to Canada's administrative waiver of the application of Regulation 20(1)(a) for all U.S. railway workers from November, 1979 until June, 1981. Brief for Amicus Curiae at 16–19. The Board, however, specifically addressed the effect of this waiver on its interpretation; the Board indicated that, although the immigration regulations were administratively waived for 19 months with respect to railroad workers, service coverage under the two statutes was not to be an "on again, off again" proposition based upon administrative or operational changes in a country's immigration policy. R. at xxvi. Instead, once the Board determines that a country's *laws* satisfy the service exception's requirement, the Board will decline to examine the laws' *operation* to determine whether in practice those laws operate with the restrictive sweep facially indicated.[13]

In our view, this is an entirely sensible approach, by virtue of the values of certainty and predictability fostered by the Board's interpretive method (not to mention the obvious difficulties in administration spawned by a contrary approach). But even so, the Board left the door partially ajar; under its approach, an exception might arise if the waiver represented a clear statement of permanent government policy or of a reciprocal employment agreement applicable to railroad employees generally, as opposed to an ad hoc waiver (of limited duration).

Neither the Association nor the Government of Canada has persuasively rebutted either the Board's determination of the effect of Canadian law or the validity of the interpretive guides upon which the Board relied. The record is sufficient, we believe, to enable us to make a reasoned determination of Canadian law. And in so doing, we find ourselves in accord with the Board essentially for the reasons stated by it. We thus agree that Canadian law creates a preference for the hiring of Canadians which, both facially and as applied, imposes barriers to the employment of non-Canadians so stringent that they "in effect" require an employer to hire Canadians.

C. *Application of the Board's Decision to Elected Union Representatives.*

■ As we noted above, *see supra* p. 468, both the RRA and the RUIA cover service rendered to any U.S. railway labor organization, whether it is performed within or without the United States. Both statutes therefore cover service performed by elected union officials within Canada. Without addressing the question in detail, the Board in the course of its decision determined that the service exceptions apply to elected union officials. The reason was that unions—just as all other employers operating in Canada—are in effect required, at least in part, to hire Canadians for *other* positions. The Board stated, in essence, that if *some* of an employer's employees come within the exception, then *all* do.

The Association challenges the Board's determination as unreasonable, and the application of the service exception to elected union officials as improper. Brief for Petitioner at 37–39. The Association asserts that Canadian law does not control in any respect the citizenship or residency of elected union officials and that there is no record evidence that any U.S. labor organization active in Canada actually employs support staff in Canada.

We agree with the Board that, even if Canadian immigration law is inapplicable to

---

**13.** We do not find troubling what may appear to be an inconsistency between the Board's position on this point and its view that a facially neutral law can trigger the service exception if its *application* in effect requires foreign citizens or residents to be hired in whole or in part. If a country's laws facially trigger the exception, then the Board is free to adopt the view that those laws may not be saved by virtue of their effects as applied.

elected union officials, a union that in fact hires employees (other than elected officials) would come within the exception. If, on the other hand, the Association is correct that union employers do not as a matter of course employ in Canada persons other than elected union officials, a genuine question exists concerning the lawfulness of applying the service exception to elected union officials, inasmuch as they may be a particular union's only employees in Canada. This issue, we are persuaded, depends on several factual matters not in the record before us. Moreover, the parties have neglected to focus on the legal questions that could arise depending on what the facts are. For these reasons, we therefore decline once again to pass on the correctness of the Board's application of the exception to elected union officials, vacate the Board's ruling with respect to the issue, and remand for reconsideration by the Board.

### III

█ The final issue before is the Association's complaint that the eighteen-month period between this court's decision in *RLEA I* in December 1984 and the Board's decision in May 1986 constituted unreasonable delay, which prejudiced affected Canadian employees. Accordingly, the Association requests that (assuming the Board's decision is upheld) we limit the effective date of its ruling to May 6, 1986 (the date of the Board's decision). The Board replies that the eighteen-month period was not unreasonably long in light of the importance and difficulty of the issues, and that the delay was necessary to coordinate implementation of the RRA and RUIA with implementation of the RRTA by IRS. The Board also argues that its actions did not prejudice the rights of any Canadian employees.

The Association urges us to review its claim of unreasonable delay in light of the factors set forth in *Telecommunications Research Action Center v. FCC*, 750 F.2d 70 (D.C.Cir.1984) (*TRAC*). In *TRAC*, however, the issue was whether this court had jurisdiction (and, if so, exclusive jurisdic-

tion) to compel FCC action unreasonably delayed, questions we resolved in the affirmative. In the course of that decision we set forth guidelines for evaluating the appropriateness of compelling agency action alleged to be unreasonably tardy. *See TRAC*, 750 F.2d at 79–80.

Here, of course, the Association does not seek to compel agency action unreasonably withheld; rather, it is seeking to modify final action already taken by the Board on the ground that the agency unreasonably delayed in reaching its decision. For this reason, *TRAC* is not directly apposite. We do, however, review petitioner's claim of unreasonable delay to determine whether the eighteen-month period was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). *Cf. TRAC*, 750 F.2d at 76 n. 29.

We are persuaded that the claim of unreasonable delay is ill-founded. The Association has failed to show that any Canadian employees were prejudiced by the Board's delay (even assuming it to be unreasonable). The Association claims that the Board's delay adversely affected some 2000 employees and pensioners, whose service during the years 1983–1985 was effectively treated as if subject to the service exception, even after this Court's decision in *RLEA I*. Brief for Petitioner at 40.

But our holding today establishes that those employees and pensioners have obviously *not* been adversely affected by the *delay* (as opposed to the decision itself). In addition, as the Board argues, since the time of the General Counsel's original Legal Opinion (March 1983), Canadian employees have been on notice that service to American employers after the end of 1982 would in all likelihood not be included in benefits payments. Brief for Respondent at 34. The Board has therefore not placed Canadian employees in a position where benefits received during the Board's deliberations must be repaid due to retroactive rescission of coverage. Petitioner's claim of unreasonable delay is therefore untenable inasmuch as the Association does not seek further administrative action, and

there clearly was no prejudice to any affected party.

## IV

We affirm the Board's decision in the main and deny RLEA's request for relief due to unreasonable delay. We vacate, however, the portion of the Board's decision extending its application to elected union officials and remand to the Board for reconsideration of that issue in accordance with this opinion.

*It is so ordered.*