**John VOLLMAR and James Mitchell, On behalf of themselves and all other persons similarly situated, Plaintiffs,**

v.

**CSX TRANSPORTATION, INC., Defendant.**

Civ. A. No. 88–0938–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 10, 1989.

William H. Callaway, Jr., Richard A. Allen, Jayme Rizzolo Epstein, Sherrice A. Knisely, Zuckert, Scoutt & Rasenberger, Washington, D.C., for plaintiffs.

Jay D. Zeiler, Ronald M. Johnson, Jonathan A. Gruver, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I. *Introduction*

This conditionally certified class action grows out of a unique context and presents novel questions. Plaintiffs are Canadian employees of defendant who claim that their various unions negotiated a lower wage increase in 1973 than otherwise would have been the case in return for defendant's agreement to pay a greater share of plaintiffs' retirement taxes and to seek legislation to accomplish this. Congress obliged; it passed the Railroad Retirement Act of 1974 (the "Act"), 45 U.S.C. §§ 231 *et seq.* For five years the arrangement worked. Then, in 1978, as a result of changes in Canadian immigration rules, changes beyond the control of plaintiffs or defendant, the Railway Labor Board ruled that Canadian employees of United States railroads could no longer participate in the system of pension benefits under the Act. Railroads and their Canadian employees were permitted to recover the pension contributions they had made. In plaintiffs' view, this result deprived them of the benefit of the bargain their unions struck with defendant in 1973; defendant recovered the pension contributions it made on plaintiffs' behalf; plaintiffs recovered their own contributions and were excluded from the Act's benefits; yet nothing was done to restore plaintiffs' demand for wage increases they claim were foregone in 1973 as part of the bargain. In other words, as plaintiffs see it, defendant won a wage concession from the unions, but ultimately gave up nothing for this benefit, whereas plaintiffs accepted lower wages, but contrary to the premise of the bargain, received nothing in return for this detriment. Thus, plaintiffs, citing contract and quasi contract theories, now seek recovery for the unquantified wage increases they claim were foregone in 1973.

The matter is before the Court on plaintiffs' summary judgment motion. The par-

ties' extensive briefs and affidavits[1] and the range of issues raised make clear that a more complete explication of the facts is needed for adequate illumination of the parties' claims.

## II. *Facts*

### A. *The Parties*

Defendant, CSX Transportation, Inc. (CSXT), is a Virginia corporation engaged in the business of operating a railroad that includes approximately 20,000 miles of track in the United States and 200 miles in Canada's Ontario province. In its current form, CSXT is the result of a series of railroad mergers. Among the predecessor railroads are the C & O Railway (the Chessie System) which included the Pere Marquette Railroad Company, a Canadian railroad.[2] CSXT employs some 34,000 persons, of whom 200 are Canadian citizens working for CSXT in Canada.

Plaintiffs, John Vollmar and James Mitchell are two of CSXT's Canadian employees. Vollmar is a clerk, while Mitchell is a conductor. They sue on behalf of themselves and all others similarly situated. Following briefs and a hearing on the class certification question, the Court, pursuant to Rule 23(b)(2), Fed.R.Civ.P., conditionally certified the following class:

> All past and present unionized employees of defendant CSX Transportation, Inc. and its predecessor companies ("CSXT") who have resided and worked for CSXT in Canada and whose retirement benefits under the Railroad Retirement Act were terminated or curtailed by the Railroad Retirement Board's ruling of January 10, 1984 (adapting its General Counsel Opinions L–83–79 and L–83–79.2), as affirmed upon remand from its ruling of May 6, 1986, and the heirs and successors of such employees.

The certification is conditional because CSXT sharply disputes plaintiffs' standing to assert the claims at bar. Resolution of the standing issue in a manner favorable to plaintiffs is a prerequisite to final class certification.

Most CSXT employees in Canada and the United States are represented by unions. In the railroad industry, again in both Canada and the United States, each craft or class is represented by a different union. There are eleven different crafts of CSXT employees represented by eleven separate unions. Each union represents both American and Canadian employees, the latter through subunits of the American-based international. Plaintiff Vollmar, as a clerk, is represented by the Transportation Communications Union International. Plaintiff Mitchell, as a conductor, is represented by the United Transportation Union. Collective bargaining agreements between CSXT and each of the craft unions cover both American and Canadian employees.[3] These agreements cover the terms and conditions of employment, but none provides for pension benefits or a retirement plan. As more fully described below, since 1937, pension or retirement benefits for railroad employees have been provided exclusively by the congressionally established United States Railroad Retirement System. Canadian employees are also covered under the Canada Pension Plan, Canada's equivalent of Social Security.[4]

---

1. A combined total of more than 250 pages of briefs and affidavits and 600 pages of exhibits have been submitted by the parties.

2. Some of the events described herein involved CSXT's predecessor, the C & O Railway Company. For the sake of clarity, reference to CSXT is deemed to include its predecessors where pertinent.

3. There is one exception to this: CSXT has two different agreements with the yard conductor unit of the conductors union, one for American employees and one for Canadian employees. This exception is immaterial to the issues presented.

4. The Canada Pension Plan is funded through payroll taxes paid equally by the employer and the employee to Revenue Canada, the Canadian IRS. The tax rate is 2% of wages up to a maximum of 26,500 Canadian dollars. The rights, duties and entitlements of employees and employers under the Canada Pension Plan are separate from, and independent of, rights, duties and entitlements under the U.S. Railroad Retirement System. Plaintiffs' entitlement to Canadian benefits is unaffected by any ruling in this case. The Canada Plan is mentioned merely for the purpose of providing a more complete picture.

## B. *The Railroad Retirement System* [5]

Enacted as a response to the Great Depression, the United States Railroad Retirement System (System) has been in effect since 1937. The Railroad Retirement Act, 45 U.S.C. §§ 231, *et seq.*, defines the structure of the System, the class of eligible employees, the eligibility requirements for benefits as well as the types and levels of such benefits.[6] In essence, the System covers employees of American railroads and their affiliates. This includes foreign employees of American railroads who work in a foreign country. Significantly, however, a 1940 amendment to the Act excludes from the Act's coverage any foreign employees working in a country whose immigration laws require railroads to employ citizens of that country. This "Foreign Exclusion" reads, in pertinent part, as follows:

> Notwithstanding the provisions of subdivisions (1) and (2) of this subsection, an individual not a citizen or resident of the United States shall not be deemed to be in the service of an employer when rendering service outside the United States to an employer who is required under the laws applicable in the place where the service is rendered to employ therein, in whole or in part, citizens or residents thereof.

45 U.S.C. § 231(d)(3) (1940).

The System is administered by the Railroad Retirement Board (the Board), a federal agency charged with determining whether an employee is eligible for benefits and the appropriate level of benefits.[7] It also disburses benefits to eligible employees, their spouses or survivors. Benefits include retirement annuities (i.e., pension payments), disability annuities and supplemental annuities. The Act establishes a complex set of rules governing entitlement to the various benefits. In general, employees must have 120 months of creditable railroad service to qualify. As noted, the Board is the arbiter of eligibility.

The Systems' funding mechanism is established and described in the Railroad Retirement Tax Act (Tax Act), 26 U.S.C. §§ 3201 *et seq.* The primary funding source is a payroll tax levied on the employer and the employee. Amounts paid to the IRS as railroad retirement taxes are based on income levels. In this respect, the System resembles Social Security. The Tax Act specifies the railroad retirement tax rates and percentages to be paid by the employer and employee. The employer withholds the employee's share and remits it and the employer's share directly to the IRS. *See* 26 U.S.C. § 3202 (1982).

Retirement tax levels and percentage contributions have varied over time. From 1937 through September, 1973, the burden was shared equally by the employer and the employee; each made equal railroad retirement contributions of 10.6% of each employees' earnings. As a result, at least in part, of the 1973 negotiations between the railroads and the unions, Congress amended the Railroad Retirement Act to implement basic changes in structure. To begin with, the 1973 amendments discarded the previous system of equal employee-employer contribution to the System. In its place, Congress substituted a two-tiered structure. Tier I taxes are essentially equivalent to Social Security taxes. Tier I taxes are paid by the railroads and the employees in equal amounts calculated on the basis of earnings and years of service. Until 1977, the Tier I tax rate for both

---

**5.** For a more complete description of the System, see United States Railroad Retirement Board, *Informational Conference Handbook* January 1988 (hereinafter "Retirement Handbook"); *See also Railway Labor Executives' Ass'n v. U.S. Railroad Retirement Board*, 749 F.2d 856 (D.C.Cir.1984) (hereinafter "*RLEA I* "); *Railway Labor Executives' Ass'n v. U.S. Railroad Retirement Board*, 842 F.2d 466 (D.C.Cir.1988) (hereinafter "*RLEA II* ").

**6.** The basic eligibility requirement is 120 months of "creditable service," service performed for a United States railroad. *See* 45 U.S.C. §§ 231a, 231n; 20 C.F.R. § 210.5 (1988). The level of benefits depends chiefly on length of creditable service and amount of lifetime earnings. Retired railroad employees who receive benefits under the Act do not also receive social security benefits.

**7.** The Board also administers the federal program for railroad workers' unemployment benefits. *See* Railroad Unemployment Insurance Act, 45 U.S.C. §§ 351 *et seq.*

employee and employer was 5.85% of earnings, a rate equivalent to the social security tax rate. Thereafter, the Tier I tax rate changed as follows: [8]

1978 ......................... 6.05%
1979–80 ..................... 6.13%
1981 ......................... 6.65%
1982–83 ..................... 6.70%

Tier II taxes, "are designed to fund benefits comparable to those paid over and above Social Security benefits by other industrial pension systems." Retirement Handbook at 5. Until 1981, the railroads paid all the Tier II taxes. In that year, Congress enacted a 2% Tier II tax on employees and this rate was subsequently raised by amendments in 1983 and 1987. The following table summarizes the history of Tier II taxes: [9]

Tier II Taxes

| Year | Employee | Employer |
|------|----------|----------|
| 1973–1980 | 0 | 9.5% |
| 1981–1983 | 2% | 11.75% |
| 1984–1985 | 2.75% | 12.75% |
| 1986 | 3.5% | 13.75% |
| 1987 | 4.25% | 14.75% |
| 1988 | 4.9% | 16.10% |

At present, therefore, CSXT pays railroad retirement taxes for its covered employees at the rate of 23.16% of creditable earnings while covered employees pay, through payroll deductions, the lesser percentage of 12.41%.

### C. The 1973 Memorandum of Understanding

In 1973, prior to March, the U.S. railroads and various railroad unions engaged in collective bargaining on a wide range of issues, including wages and railroad pension taxes. According to plaintiffs, the unions' wage increase demands ranged from 10–15%. At the time, as previously noted, the railroads and employees were making equal contributions to railroad retirement; each was paying railroad pension taxes at the rate of 10.6% of each employee's creditable earnings. As a result of the 1973 negotiations, the parties ultimately reached agreement on a variety of issues. The agreement was embodied in the Memorandum of Understanding, signed by the parties on March 7, 1973. Of specific interest here are the agreements reached on wages and pension tax rates. The wage increase agreed upon was 4% effective January 1, 1974. The parties also agreed to press Congress for changes in the System, the most significant of which, for this case, was the railroad's agreement to assume the burden of paying the employees' retirement tax burden above 5.85%, the social security rate.[10]

The terms of the Memorandum of Understanding were carried out; first, the 4% wage increase was embodied in each of the eleven collective bargaining agreements; second, Congress passed the 1973 amendments to the Act which resulted in increasing the railroad's tax burden 4.75%, from 10.6% to 15.35%, thereby reducing the employees' burden 4.75%, from 10.6% to 5.85%, the social security rate. This tax burden shift, of course, had the effect of increasing the employees' take home pay.

. . . . .

### B. Collective Bargaining Agreements

. . . . .

2. All national collective bargaining agreements will dispose of the current national notice and local notices covering the same subject matter, and will:

(a) Provide for a general wage increase of 4% effective January 1, 1974.

. . . . .

5. The provisions of this Part B are contingent upon the enactment of legislation accomplishing the purposes specified in Part A hereof.

(Memorandum of Understanding (March 7, 1973)).

---

**8.** Source: Retirement Handbook at 58.

**9.** Id.

**10.** The pertinent provisions from the Memorandum of Understanding read as follows:
 A. *Railroad Retirement Legislation*
 The carriers and the railway labor unions will jointly support legislation which will accomplish the following:

. . . . .

 (c) The Railroad Retirement Tax Act to be amended to provide that commencing October 1, 1973 the employers will assume the 4.75% of the employee taxable compensation in excess of the 5.85% employee Social Security tax (a maximum of $42.75 per employee per month in 1973, and a maximum of $47.50 per employee per month in 1974).

Plaintiffs claim the unions and their memberships acquiesced in the modest 4% wage increase and gave up demands for higher (10–15%) increases specifically in return for the railroad's agreement to bear the additional 4.75% railroad retirement tax burden. It was, they claim, a clear *quid pro quo*. CSXT, in its papers, initially appeared to contest this point. In oral argument, however, CSXT's counsel seemed to concede it.[11] And so it should be conceded, for there is substantial documentary support for plaintiffs' *quid pro quo* characterization. The 1973 Memorandum of Understanding and each of the collective bargaining agreements explicitly stated that they were "contingent upon the enactment of" legislation implementing the railroad retirement tax aspects of the 1973 Memorandum of Understanding. Beyond this, numerous statements in the legislative history make the same point. For example, the railroads' chief negotiator stated in his congressional testimony that "the most relevant feature of the labor contract is the fact that by its terms it will become effective only if legislation reflecting the recommendations of the parties on the retirement system is enacted." *Hearings on H.R. 7200 Before the House Comm. on Interstate & Foreign Commerce*, 93d Cong., 1st Sess. 48 (1973). Moreover, there is abundant evidence that the unions only accepted lower wage increases because the railroads were to assume a greater share of the tax burden. The union's chief negotiator noted that the unions "would never have signed up for a 4 percent [increase]... if [they] hadn't had an improvement in [their] pension plan." *Id.* at 105–06. Senator Schweicker expressed the same view, saying "there is no question ... that the reapportioning of the taxes from the railroad retirement pension from the employee to the employer was considered a payment along with the (4 percent) wage increase and a part of the package." *Id.* at 156–57. The then associate general counsel of the Board put it in the most direct terms:

[B]oth labor and management recognized during the course of the hearings that a 4 percent wage increase would have been unacceptable to railroad employees without further increase in their net pay resulting from the proposed tax reduction [to the employee].

D. Schreiber, *The Legislative History of the Railroad Retirement and Unemployment Insurance Systems* 442 (1978). It is, therefore, essentially uncontroverted that the unions' acceptance of a 4% wage increase rather than a larger percentage increase was a *quid pro quo* for the railroads' agreement to pay an additional 4.75% of the retirement taxes. This resulted in an increase in plaintiffs' take-home pay, both because they paid less in retirement taxes and because they received a 4% wage increase.

In 1974, Congress enacted further changes in the System. The 1974 amendments established the previously described two-tier tax structure. The Senate report accompanying these amendments describes the 1973 amendments as making fundamental changes in the System:

Last year, Public Law 93–69 [the 1973 Amendments] was enacted, carrying out an agreement between management and labor reached through collective bargaining, under which the railroads assumed the responsibility for hereafter paying all taxes required to support the Railroad Retirement System in excess of the Social Security tax rate, which would be paid by the employees.

The enactment of that Act significantly changed the character of the Railroad Retirement System. Whereas it formerly was a Federal retirement system, supported, as is Social Security and Civil Service Retirement, by equal amounts paid by the employers and the employees, the Railroad retirement system is today, in essence, a company pension program administered, for historical reasons, by the Federal Government.

**11.** (Transcript of November 18, 1988 Hearing on Motion for Summary Judgment at 18, line 7 through 20, line 15).

Tier I benefits hereafter paid to retirees, their dependents, and survivors will be a Social Security benefit, paid by the Social Security system through financial interchange; Tier II benefits will be based solely on railroad service, and will be paid for entirely by the railroads.... Future changes in Tier II benefits will arise out of collective bargaining between the railroads and the unions.

S.Rep. No. 1163, 93d Cong., 2d. Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5702, 5714.

### D. *The Exclusion of Canadian Employees From the System*

The System provides benefits to domestic and foreign employees of U.S. railroads. But, as noted previously, the Act and the Tax Act include an exception to this coverage dating from 1940: foreign employees working for U.S. railroads in a foreign country are excluded from the System if the foreign country requires railroad employers to employ that foreign country's citizens. In April 1978, the Canadian government issued regulations under the Canadian Immigration Act arguably requiring railroads operating in Canada to hire Canadians. Thereafter, in 1983, first the IRS and then the Board issued rulings to the effect that the Canadian immigration regulations triggered the Act's 1940 exclusion for foreign employees.[12] The Board's ruling was appealed to the D.C. Circuit Court of Appeals by the Railway Labor Executives' Association (RLEA), an association of unions, including those representing CSXT's Canadian employees. The D.C. Circuit vacated the Board's ruling and remanded for further explanation of its ruling. *RLEA I.* The Board, in response, adhered to its original ruling and furnished the requisite explanation. *RLEA II,* 842 F.2d at 470–71. On the second appeal, the D.C. Circuit, in March 1988, essentially affirmed. *RLEA II,* 842 F.2d at 476.[13] No Supreme Court review was sought.

Certain effects of the Board's ruling merit elaboration as they are at the heart of the plaintiffs' class definition. First, December 31, 1982 is the cutoff date for CSXT's Canadian employees to receive credit toward retirement; no service after this date counts for retirement benefits. For the period April 10, 1978 (the date of the triggering Canadian regulations) to December 31, 1982, Canadian employees have a choice: They could choose to leave their retirement tax payments in the System and receive full credit for service during this period or, alternatively, they could request a refund of the taxes they paid for all or part of this period, in which event they would receive no credit for service to the extent of any refund. Credit for service prior to April 10, 1978 was unaffected. Thus, CSXT's Canadian employees who retired or resigned prior to December 31, 1982 were not affected by the Board's ruling.

Yet another effect of the Board's ruling was to give railroads the option to apply for a refund of railroad retirement taxes they paid in connection with services rendered by their Canadian employees during the period April 10, 1978 to December 31, 1982. Significantly, receipt of a refund by a railroad does not affect credit for service or entitlement to benefits of any Canadian employee who elected to leave his or her taxes in the System. Pursuant to the option given the railroads, CSXT applied for a refund of the railroad retirement taxes it had paid in connection with services rendered by its Canadian employees during the 1978–82 period. CSXT also applied for refunds on behalf of some 245 of its Canadian employees who had indicated a desire to receive refunds of the amounts they had paid into the System. The Department of the Treasury refunded the sums with interest. The Treasury did not do the accounting to segregate the employees' contributions from the CSXT's. CSXT performed this accounting. CSXT's employees received from CSXT refunds of their Tier I

---

**12.** *See* Rev.Rul. 83–184, 1983–2 C.B. 173 (1983); General Counsel of Railroad Retirement Board Legal Opinion L–83–79 (March 25, 1983) and L–83–79.1 (May 11, 1983).

**13.** The D.C. Circuit generally affirmed, but also remanded to have the Board clarify its ruling on whether it applied to Canadians employed as union officials. *RLEA II,* 842 F.2d at 476.

and Tier II [14] railroad retirement tax contributions, including interest that accrued during the time required for CSXT to complete the accounting. CSXT ultimately retained over $7,000,000 in Tier I and Tier II retirement taxes it had paid into the System for its Canadian workers.

### E. *Events Since 1974*

Some post–1974 events, apart from the System's exclusion of Canadian employees, merit mention. Since the implementation of the Memorandum of Understanding, the railroads and the unions have negotiated several wage increases and numerous collective bargaining agreements, including agreements entered into in 1985 and 1986, after the Board's rulings.

Also, as previously described, Tier I and Tier II taxes have increased over time to guarantee the financial stability of the retirement system. For example, the 1981 Amendments to the Railroad Retirement Act increased Railroad Retirement taxes on both railroad employers and employees. Before these amendments, only employers paid Tier II taxes. After these amendments, employees were required also to pay Tier II taxes. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 97th Cong., 1st Sess. §§ 1116–26 (1981), 95 Stat. 628–39. In 1983, unsuccessful attempts were made to ensure the financial solvency of the System through The Railroad Retirement Solvency Act of 1983, Pub. L. No. 98–76, 98th Cong., 1st Sess. (1983), 97 Stat. 411, and the related Railroad Retirement Revenue Act of 1983, Pub.L. No. 98–76. The latter again raised Tier II taxes on both employees and employers. The most recent amendment of the Railroad Retirement Act occurred in 1987. Once again, Tier II tax rates were increased for both employers and employees. Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 100th Cong., 1st Sess. §§ 9031–34, 101 Stat. 1330–296.

In August and September of 1988, CSXT, together with other U.S. carriers with Canadian employees, were approached by various labor unions representing these workers. The unions proposed the establishment, via a new collective bargaining agreement, of pension and other benefits equivalent to those curtailed as a result of the Board's rulings. These negotiations have not, as yet, resulted in the establishment of such a pension scheme.[15]

### III. *Issues Presented*

The parties' briefs and supporting papers are voluminous. Many issues and arguments have been raised. Not all of them are either worthy of extended attention or central to the resolution of CSXT's motion. This section seeks to separate some of the chaff from the wheat thereby sharpening the focus on the central questions presented.

CSXT seeks to characterize plaintiffs' claim as one for railroad retirement benefits. In this regard, CSXT correctly points out that such benefits are statutory, not contractual, and thus may be altered or eliminated at any time.[16] Yet this is not dispositive, for it appears that plaintiffs' claim is not for railroad retirement benefits, survivor benefits or the like. They recognize these are foreclosed now by operation of law. Similarly, plaintiffs do not seek to attack, directly or collaterally, the judicially affirmed Board ruling excluding Canadian employees from the System. CSXT again correctly points out that such an argument must fail; the Board's ruling cannot be attacked collaterally in this action.[17] Here again, plaintiffs concede this

---

**14.** Canadian employees made Tier II contributions only from 1981 to 1983.

**15.** Plaintiffs have stated that in the event a plan is established for Canadian workers any proceeds they might receive from this suit will be turned over to this plan.

**16.** *See, e.g., Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *Ruhl v. Railroad Retirement Board,* 342

F.2d 662, 666 (7th Cir.), *cert. denied,* 382 U.S. 836, 86 S.Ct. 81, 15 L.Ed.2d 78 (1965); *Murray v. Railroad Retirement Board,* 289 F.2d 386, 388 (4th Cir.1961).

**17.** *See Denberg v. U.S. Railroad Retirement Board,* 696 F.2d 1193 (7th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984); *see also United States v. Southern Ry.,* 380 F.2d 49, 53–54 (4th Cir.1967).

point but correctly assert its irrelevancy. Instead, the real essence of plaintiffs' claim may be seen from the following summary:

(i) In 1973, as the Memorandum of Understanding reflects, a bargain was struck between the railroads and the unions: acceptance of a 4% wage increase and forbearance from pressing for a larger increase in return for the railroads shouldering a portion of the retirement tax burden previously borne by the employees. Put another way, the bargain was plaintiffs' wage concessions in consideration for CSXT paying more money towards railroad retirement benefits for these plaintiffs.

(ii) Consistent with this bargain, Congress revised the System to increase the level of the railroads' contributions and to reduce the level of the employees' contributions. In so doing, Congress acknowledged that the changes were the result of the bargain.

(iii) Due to a change in Canadian law, plaintiffs were subsequently excluded from the System. Thus, while the railroads continue to receive the benefit of their bargain, plaintiffs claim it has become impossible for them to receive the benefit of their bargain.

(iv) Although CSXT's ability to make payments in the manner agreed to has become impossible, CSXT is still obligated under the common law contract remedy of impossibility and the quasi-contract remedy of unjust enrichment to provide plaintiffs with the full value of the bargain. In damages, plaintiffs seek restitution to them of the railroad retirement taxes originally paid by CSXT on their behalf and subsequently refunded to CSXT. Plaintiffs also seek recovery of future payments.

Viewed in this way, plaintiffs' claims raise the following legal issues:

(1) Does the 1973 Memorandum of Understanding[18] create contract and quasi-contract rights which may be enforced in federal court?

(2) If so, have these rights been extinguished by subsequent congressional and administrative actions?

(3) If private rights were created by the 1973 Memorandum of Understanding and not extinguished by subsequent congressional and administrative action, can these rights be enforced by plaintiffs or must the action be brought by plaintiffs' various unions? Further, must the plaintiffs or the unions, as the case might be, submit the issue to arbitration?

(4) Finally, does the applicable statute of limitations bar this proceeding?

## IV. Analysis

### A. Procedural Bars to Plaintiffs' Suit[19]

CSXT argues that plaintiffs are procedurally barred from pursuing their claims before this Court because:

(1) only the unions, not plaintiffs, have the requisite standing to pursue these claims;

(2) plaintiffs' claims must be arbitrated; and

(3) plaintiffs' claims are untimely and barred by the applicable statute of limitations.

None of CSXT's arguments, however, are ultimately persuasive.

#### 1. Standing

■ The eleven collective bargaining dispute resolution provisions at issue confer standing on employees to pursue their own claims.[20] CSXT nonetheless asserts that

---

**18.** The parties agree that the 1973 Memorandum of Understanding is a collective bargaining agreement.

**19.** CSXT's procedural arguments are dealt with both in the interests of good judicial husbandry and because they are potentially dispositive.

**20.** All eleven state that "all claims or grievances must be presented in writing *by or on behalf* of the employees ..." (emphasis added). All eleven add that appeals may be "instituted *by the employee* or his duly authorized representative ..." (emphasis added). This language clearly allows employees to pursue their own claims.

only plaintiffs' unions [21] have standing to pursue these claims under applicable law: either the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, or Canadian labor law. CSXT is mistaken.

■ The RLA governs collective bargaining and grievance procedures between railroads and their employees. Disagreements are classified as either "minor" or "major" disputes. *See Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), *aff'd on rehearing*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946).[22] A minor dispute is a disagreement over the interpretation of the collective bargaining agreement.[23] A major dispute is a disagreement over the formation of, or change in the substance of, the collective bargaining agreement. Major disputes must be resolved through an exhaustive, RLA mandated mediation

process before workers may strike.[24] Under the RLA, the union—barring allegations that it breached its duty of fair representation [25]—exclusively controls the prosecution of major disputes.[26] According to CSXT, the instant dispute is major because plaintiffs request injunctive and declaratory relief which is awarded under the RLA major dispute provisions. Therefore, CSXT asserts that only plaintiffs' unions have standing to bring these claims.[27]

■ The flaw in this argument is that the RLA dispute resolution provisions are not applicable to the case at bar. By its terms, the RLA's jurisdiction is equal to that of the Interstate Commerce Commission.[28] The Interstate Commerce Commission's jurisdiction reaches only transportation that "is in the United States." 49 U.S.C. § 10501(a)(2) (1982).[29] Courts,

21. For reasons unknown to the Court, plaintiffs' unions have chosen not to pursue these claims.

22. As the court noted in *Brotherhood of Locomotive Engineers v. Burlington Northern R. Co.*, 838 F.2d 1087, 1090 n. 3 (9th Cir.1988), "[t]he terms 'major' dispute and 'minor' dispute are not found anywhere in the RLA. The Supreme Court in *Elgin* coined the terms as a methodology to be used by courts confronted with disputes arising under the RLA." The *Elgin* decision, therefore, provides both the original source and the best explanation of the distinction between major and minor disputes.

23. *See Kushto v. Brotherhood of Ry. Airline and S.S. Clerks*, 818 F.2d 290, 292–93 (4th Cir.1987) ("dispute over the supposed contract for severance pay is a 'minor' dispute because it relates directly to the [interpretation of the] collective bargaining agreement between the railroad and the union ...").

24. *See Brotherhood of Locomotive Engineers v. Burlington Northern Ry*, 838 F.2d 1087, 1090–91 (9th Cir.1988) (describing procedures followed in handling major disputes). The lengthy mediation process is intended to provide a cooling-off period for defusing labor strife and to discourage strikes. *See Elgin Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. 711, 723–25, 65 S.Ct. 1282, 1289–91, 89 L.Ed. 1886 (1945).

25. Employees have standing to bring breach of duty fair representation claims. *See, e.g. Kushto v. Brotherhood of Ry., Airline & Steamship Clerks*, 818 F.2d 290, 293 (4th Cir.1987). There is no allegation in this case that plaintiffs' unions breached their duty of fair representation.

26. *See, e.g. National Airlines v. International Ass'n of Machinists*, 478 F.2d 1062, 1065 (5th Cir.1973) (union settlement of disagreements arising from major disputes was binding on employees—only union could represent employees in major dispute); *Cafferty v. Trans World Airlines*, 488 F.Supp. 1076, 1079 (W.D.Mo.1980); *IAM v. Compagnie Nationale Air France*, 414 F.Supp. 538, 541 (E.D.N.Y.1976).

27. Plaintiffs assert that there is also a third category of disputes made up of claims that a given collective agreement is invalid. Relying on *Felter v. Southern Pacific Co.*, 359 U.S. 326, 327 n. 3, 79 S.Ct. 847, 850 n. 3, 3 L.Ed.2d 854 (1959), *Goclowski v. Penn Central Trans. Co.*, 571 F.2d 747, 756 (3d Cir.1977) and *Seaboard World Airlines, Inc. v. Transport Workers Union*, 425 F.2d 1086, 1090 (2d Cir.1970), plaintiffs argue that these claims must be brought in federal court. Plaintiffs argue that their unjust enrichment claim falls within this third category. Because this Court later dismisses the unjust enrichment claims, *see infra* Section IV(B)(2), the third category has no bearing on the resolution of this dispute.

28. The RLA defines employee as "every person in the service of a carrier ... who performs any work defined as that of an employee ... in the orders of the Interstate Commerce Commission now in effect ..." 45 U.S.C. § 151, Fifth (1982).

29. The Interstate Commerce Act was recodified in 1978. The recodification, however, was not meant to alter any substantive provision or meaning of the original statute. *See Trailer Marine Transport Corp. v. Federal Maritime Comm.*, 602 F.2d 379, 389 (D.C.Cir.1979). Juris-

therefore, have uniformly precluded RLA jurisdiction over disputes involving employees who perform services wholly outside the United States.[30] Most recently, in another dispute between CSXT and its Canadian employees, the court found that the "RLA does not have extraterritorial effect to govern employees who are citizens of another country and who work solely in that country." *Rastall v. CSX Corp.*, 696 F.Supp. 683, 684 (D.D.C.1988).[31]

 Even if applicable, however, the RLA does not bar standing. Plaintiffs' claims are minor disputes. They are garden variety disagreements over the interpretation of an existing collective agree-

ment. *See Kushto v. Brotherhood of Ry., Airline & Steamship Clerks*, 818 F.2d 290 at 292–293 (4th Cir.1987) (describing minor disputes). Even if this classification of plaintiffs' claims is in doubt, "courts construe [such] disputes as minor." *Brotherhood of Locomotive Engineers v. Burlington Northern Ry. Co.*, 838 F.2d at 1091.[32] In sum, the RLA is no bar to plaintiffs' claims.

CSXT argues that if the RLA is not applied, Canadian labor law must be applied because the RLA's jurisdiction was limited to prevent possible conflicts with foreign nations' regulation of their citizens.[33] Thus, CSXT asserts that plaintiffs

---

dictional decisions prior to the recodification remain authoritative.

**30.** *See Air Line Stewards and Stewardesses Ass'n v. Northwest Airlines*, 267 F.2d 170, 175 (8th Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959) ("[T]he Railway Labor Act ... has no application outside the continental United States and its territories. By its terms, it fails to apply to employees who are hired and who perform services completely outside the United States and its territories."); *Air Line Dispatchers Ass'n v. National Mediation Board*, 189 F.2d 685 (D.C.Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951) (holding that as applied to railroads the RLA does not extend beyond the United States); *General Comm. of Adjustment v. United States*, 102 L.R.R.M. 2869, 2871 (D.Minn.1979), *aff'd sub. nom., General Comm. of Adjustment v. Burlington Northern Ry. Co.*, 620 F.2d 161 (8th Cir.), *cert. denied*, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980) (jurisdiction of arbitral board created under RLA cannot be imposed on parties under RLA, because scope of RLA limited to United States); *Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines, Inc.*, 173 F.Supp. 369, 374–78 (S.D.N.Y.), *aff'd*, 273 F.2d 69 (2d Cir.1959), *cert. denied*, 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed. 2d 1021 (1960) (limit on jurisdiction under RLA also applies to airline employees).

**31.** CSXT argues that a footnote in *Trailer Marine Transport Corp. v. Federal Maritime Comm.*, 602 F.2d 379, 389 n. 46 (D.C.Cir.1979) expanded the RLA's jurisdictional reach. In fact, the *Trailer Marine Transport* dispute is far afield from the case at bar. *Trailer Marine* concerned whether the Interstate Commerce Commission or the Federal Maritime Commission should set tariffs for a common carrier transporting goods between Puerto Rico and inland points in the United States. The court concluded that the Interstate Commerce Commission had jurisdiction over both the rail and water segments of trade between inland points in the United States and Puerto Rico because the transport ships

never entered a foreign country. The specific footnote CSXT cites reaffirms that the Interstate Commerce Commission may regulate joint through trade passing between the United States and adjacent countries on domestic carriers. This footnote is inapposite. Contrary to *Trailer Marine*, joint through trade and tariffs are not the subject of this dispute. It involves employees who work exclusively in a foreign country.

**32.** CSXT asserts that if this dispute is a minor dispute, this Court may not provide injunctive relief. Federal courts are generally not allowed to issue injunctions during labor disputes. 29 U.S.C. § 104 (1973) ("Norris–LaGuardia Act"). When, however, a case does not involve the underlying purpose of the Norris–LaGuardia Act, namely, preventing courts from enjoining strikes, courts have granted injunctive relief. *Retail Clerks Union Local 1222, AFL–CIO v. Alfred M. Lewis, Inc.*, 327 F.2d 442, 448 (9th Cir.1964) is instructive. It concerned whether a district court could order an employer to comply with provisions of the collective bargaining agreement. The *Retail Clerks* court noted:

> [i]n this case we have a 'labor dispute,' as defined in section 13, only in the most refined and technical sense. There is nothing in the complaint to suggest that either party is here using its economic powers in any way to bring pressure on the other. Here, there is a mere disagreement as to the meaning and effect of certain terms of the contract. This, we think, is not the type of 'labor dispute' to which Norris–LaGuardia is directed.

*Id; see also International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Mack Trucks*, 820 F.2d 91, 97–98 (3d Cir.1987) (same principle). *Retail Clerks* is persuasive. Injunctive relief is not barred here by the Norris–LaGuardia Act.

**33.** A Senate Committee report makes clear that these concerns played a primary role in limiting the scope of RLA provisions:

lack standing under Canadian law to bring these claims.[34] The Canada Labour Code ("Canadian Code") governs collective bargaining between railroads and their employees.[35] CSXT admits that under the Canadian Code employees may pursue their own grievances when the collective bargaining agreement expressly allows them to do so. Even then, according to CSXT, no class or representative action is permitted; employees only have power to pursue grievances on their own behalf.

The Canadian Code, like the RLA, is not applicable to the standing issue. This Court's jurisdiction is based on diversity. A federal court sitting in diversity applies the choice of law rules of its forum state. See Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under Virginia choice of law rules, the substantive law applied in interpreting a contract, including standing to sue, is the law of the place of making, that place in which the last act giving rise to the contract is completed. See KECO Indus., Inc. v. ACF Indus., Inc., 316 F.2d 513, 514 (4th Cir.1963); Chesapeake Supply & Equip-

ment Co. v. J.I. Case Co., 700 F.Supp. 1415 (E.D.Va.1988). The primary agreement at issue here, the 1973 Memorandum of Understanding, was completed in the District of Columbia. Therefore, District of Columbia law is the applicable substantive law. The relationship between union and worker is manifestly one of agency. Under District of Columbia law, a principal may maintain an action on a written contract negotiated by his agent. See Cooper v. Epstein, 308 A.2d 781, 75 A.L.R.3d 1179 (D.C.1973).[36] CSXT opposes application of District of Columbia law to this dispute based on comity. In fact, there is no breach of comity; application of District of Columbia law to contracts made in the District of Columbia creates no direct conflict with Canadian labor law. Plaintiffs, therefore, have standing to pursue their claims.

Even assuming, arguendo, the applicability of Canadian law, the result is the same. In the case at bar, as Canadian law permits, the collective bargaining dispute resolution provisions expressly permit employees to pursue claims on their own behalf.[37] Plaintiffs, therefore, clearly have standing to pursue their individual claims.[38] CSXT

The Board's ruling was based on the view that to extend the act [RLA] to cover employees based abroad would bring this labor legislation into direct conflict with labor laws of foreign countries. In addition, the Board held that to attempt application of the Railway Labor Act in a foreign country, rather than the law of the country, would be a challenge to its national sovereignty to govern within its own boundaries. It was noted that the United States would rightly reject any attempt of a foreign government to apply its labor laws in this country.
Sen.Doc. No. 163, 83rd Cong, 2nd Sess. Aviation Study 69–70 (1955) [quoted in Airline Stewards and Stewardesses Ass'n v. Northwest Airlines, Inc., 267 F.2d 170, 174 (8th Cir.1959) ].

34. CSXT's interpretation of Canadian labor law is derived primarily from an affidavit and supporting documents submitted by A. David G. Purdy of the Canadian law firm of Osler, Hoskin & Harcourt. Plaintiffs' interpretation of Canadian labor law is derived primarily from an affidavit submitted by Wesley Rayner, Dean of the School of Law of the University of Western Ontario and co-author of Carrothers, Palmer & Rayner, Collective Bargaining Law in Canada (2d. ed. 1986) (Butterworths).

35. The parties agree that in the event Canadian law applies, the controlling statute is the Canadian Code, not the labor code for the province of Ontario.

36. Plaintiffs argue that Rule 17(b), Fed.R.Civ.P., should be applied to determine their standing to sue. Under Rule 17(b), this Court would apply Virginia law and the same result would obtain. See 1A Michie's Jurisprudence: Agency § 106 (1980); Oliver Refining Co. v. Portsmouth Cotton Oil Refining Co., 109 Va. 513, 64 S.E. 56, 58 (1909); National Bank of Virginia v. Nolting, 94 Va. 263, 26 S.E. 826 (1897).

37. See supra note 20.

38. CSXT cites Governing Council of the University of Toronto (1974), 5 L.A.C.(2d) 304 (Weatherhill); Government du Quebec, Ministre de l'Education (1971), 23 L.A.C. 117 (Lande); and Re Gordon et al. and East Side Plating Ltd. et al. (1972), 26 D.L.R.(3d) 34 (H.C.J.) in support of the proposition that only unions may bring grievances to arbitration. These decisions are inapposite. In all three, the collective bargaining agreements did not allow the individual employees to participate in the arbitration proceedings. In the instant case, however, the col-

asserts, however, that only plaintiffs' unions can pursue claims in a representative capacity. CSXT relies for this proposition on *Re Canadian Broadcasting Corp. and Nat'l Ass'n of Broadcast Employees and Technicians* (1973), 4 L.A.C.(2d) 263 (Shime) and *Re Bell Canada and Communications Workers of Canada* (1982), 3 L.A.C.(3d) 413 (Burkett). These cases do make a distinction between individual and policy grievances similar to the distinction made between major and minor disputes under the RLA.[39] "Policy grievances" may only be brought by unions. Significantly, however, these decisions also recognize another category of grievance: "[g]roup grievances where a number of employees with individual grievances join together in filing their grievances. This type of grievance is really an accumulation of individual grievances...." *Re Canadian Broadcasting Corp. and Nat'l Ass'n of Broadcast Employees and Technicians* (1973), 4 L.A. C.(2d) 263, 266 (Shime).[40] Plaintiffs' grievances here clearly fall within this category because they are nothing more than an accumulation of individual breach of contract claims based on the same operative facts. Neither *Canadian Broadcasting* nor *Bell Canada* suggest that group grievances must be pursued by the unions. Indeed, the language describing group grievances suggests that, if not barred by the collective agreements, employees may pursue these grievances on their own behalf.

## 2. Arbitration

CSXT also asserts that this dispute must be arbitrated because (1) the RLA requires arbitration; (2) the Canadian Code, if applicable, requires arbitration; and (3) the collective bargaining agreements themselves require arbitration.

If the RLA were applicable, arbitration certainly would be required.[41] As previously noted, however, the RLA does not apply to this dispute.[42] Therefore, CSXT's claim that arbitration is required under the RLA is immaterial here.

CSXT also argues that arbitration is required by Canadian law. As previously discussed, Canadian law is not the applicable law.[43] Even if the Canadian Code applied, arbitration would not be required by law. The Canadian Code states, in pertinent part, that:

> [e]very collective agreement shall contain a provision for final settlement without stoppage of work, by arbitration or otherwise, of all differences between the

lective bargaining agreements do give individual employees the right to pursue their own grievances.

**39.** A union or policy grievance is one "where the subject-matter of the grievance is of general interest and where individual employees may or may not be affected at the time that the grievance is filed." *Re Canadian Broadcasting Corp. and Nat'l Ass'n of Broadcast Employees and Technicians* (1973), 4 L.A.C.2d 263, 266 (Shime).

**40.** These decisions recognize four types of grievances:

(a) individual employee grievances where the subject-matter of the grievance is personal to the employee;

(b) group grievances where a number of employees with individual grievances join together in filing their grievances. This type of grievance is really an accumulation of individual grievances;

(c) union or policy grievances where the subject-matter of the grievance is of general interest and where individual employees may or may not be effected at the time that the grievance is filed;

(d) there is a hybrid type of grievance which is a combination of the policy grievance and the individual grievance. In this type of situation, although one individual may be affected, he may be affected in a way that is of concern to all members of the bargaining unit. Thus, the individual may grieve on the basis of how he is particularly affected while the union may also grieve citing the individual case as an example of how certain conduct may affect the members of the bargaining unit generally.

*Re Canadian Broadcasting Corp. and Nat'l Ass'n of Broadcast Employees and Technicians* (1973), 4 L.A.C.(2d) 263, 266 (Shime); *see also Re Bell Canada and Communications Workers of Canada* (1982), 3 L.A.C.(3d) 413, 417–18 (Burkett).

**41.** Under the RLA, plaintiffs claims would be classified as minor disputes. Minor disputes must proceed to arbitration before a federal court may hear them. *See* 45 U.S.C. § 153 First (i) (1982).

**42.** *See supra* notes 28–31 and accompanying text.

**43.** *See supra* note 36 and accompanying text.

parties to or employees bound by the collective agreements, concerning its interpretation, application, administration or alleged violation.

Section 155(1) of Canada Labour Code, R.S. C.1970, c. L–1. The "arbitration or otherwise" language makes clear that arbitration is not the sole process allowed under the Canadian Code.[44] Notwithstanding this statutory language, CSXT, relying on *St. Anne Nackawic Pulp & Paper Co., Ltd. v. Canadian Paperworkers' Union, Local 219* (1986), S.C.R. 704, 710 (Estey), argues that Canadian courts have interpreted this provision to mandate arbitration. CSXT misinterprets *St. Anne.* This decision notes that Canadian law strongly favors arbitration of labor disputes.[45] This preference, however, does not rise to the level of mandating arbitration:

Where the parties so choose, however, the New Brunswick Act, in common with most of the other Canadian labour relations statutes, does not actually require the parties to resort to arbitration.... It requires a provision in the collective agreement for "final and binding settlement by arbitration *or otherwise,* without stoppage of work." The emphasized words indicate that, if they so choose, the parties may validly provide for a variety of other sorts of settlement mechanisms, including recourse to the courts.

*St. Anne* (1986), S.C.R. at 723.[46] In short, the Canadian Code would not compel arbitration of this dispute.

■ Arbitration, therefore, is not required[47] unless the collective agreements at issue require it.[48] CSXT argues that the

---

**44.** In the event that the collective bargaining agreement does not contain a dispute resolution procedure, the Canadian Code requires arbitration. Canadian Labour Code § 155(2). Since the parties did agree on a dispute resolution procedure, this provision is not applicable.

**45.** The *St. Anne* opinion clearly reveals a preference for arbitration of collective disputes:
What the statute does is establish a preference for arbitration of a particular sort over other means of dispute settlement, by establishing a procedure to be followed where the parties do not expressly provide for any other method of resolving their differences.
*St. Anne* (1986), S.C.R. at 723.

**46.** *St. Anne* specifically deals with the New Brunswick Act. Its analysis, however, is clearly meant to apply to all labor codes which include the "or otherwise" language, including the Canadian Code.

**47.** None of the other jurisdictions whose law might govern the collective bargaining agreements at issue here require arbitration, absent contractual agreement. *See* D.C.Code Ann. § 16–4302(a) (1981); Md.Cts. & Jud.Proc.Code Ann. § 3–207 (1984 Repl.Vol.); Mich.Comp. Laws Ann. § 600.5001 (West 1987); Va.Code § 8.01–581.02 (1984).

**48.** CSXT argues that plaintiffs' claims must be dismissed because they failed to follow the administrative procedures required by the collective bargaining agreements for filing grievances. In response, plaintiffs assert that requesting these administrative remedies would have been futile. Plaintiffs are correct. Plaintiffs' counsel twice reviewed plaintiffs' claims with the top legal officer of CSXT, Mark Aron. On October 27, 1987, a meeting occurred in Richmond

which was followed up by a letter dated November 13, 1987. Mr. Allen wrote Aron again on April 12, 1988. On both occasions, CSXT rejected plaintiffs' claims. Notwithstanding these two clear rejections from CSXT, CSXT argues that plaintiffs should have pursued their claims administratively until the claims reached Aron's desk once again. The law, however, does not require employees to pursue plainly futile administrative remedies before filing suit. The Supreme Court in *Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967), recognized that employees need not exhaust their remedies under the grievance process if the employer's conduct repudiates the contractual remedy or when the union has the sole power to file a grievance and it has wrongfully refused to do so. Plaintiffs clearly fall within the first *Vaca* exception, since Aron repudiated any administrative remedy plaintiffs might have. The Ninth Circuit's opinion in *Kaylor v. Crown Zellerbach,* 643 F.2d 1362, 1366 (9th Cir. 1981) is particularly on point. In *Kaylor,* an employee sued Crown Zellerbach for refusing to protect drivers who worked for the company's in-house trucking operation. Prior to filing suit, the union had attempted to settle the matter with Crown Zellerbach's counsel. He denied that the company was bound under the collective bargaining agreement or had any duty to the drivers. The Court found that the attorney's actions "repudiated the contractual remedy available to the drivers. The drivers were not required to exhaust the grievance procedures because filing a grievance would have been futile." *Kaylor,* 643 F.2d at 1366; *see also United Slate, Tile and Composition Roofers v. G & M Roofing and Sheet Metal Co.,* 732 F.2d 495, 501 (6th Cir.1984) (exhaustion not required where company never acknowledged that collective bargaining agreement was relevant to its operation of new facilities).

eleven collective bargaining dispute resolution provisions require arbitration. Five of the collective bargaining agreements contain one type of dispute resolution provision ("Provision I").[49] Six contain a second type of dispute resolution provision ("Provision II").[50] As the two provisions differ substantially, each is separately considered.

Provision I, in pertinent part, provides that:

[d]ecisions by the highest officer designated to handle claims and grievances shall be final and binding unless within sixty days after written notice of the decision of said officer he is notified in writing that his decision is not accepted. All claims or grievances involved in a decision of the highest officer shall be barred unless within one year from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before a tribunal having jurisdiction pursuant to law or agreement of the claim or grievance involved.

Even if Aron did not repudiate the contractual remedy, there is no requirement in law to pursue administrative remedies if they are futile. For example, in *United Protective Workers of America, Local No. 2 v. Ford Motor Company*, 223 F.2d 49, 51 (7th Cir.1955), an employee contested Ford's mandatory retirement policy. The court held that the worker need not pursue the administrative grievance procedure because it would not have afforded him a remedy. *See Glover v. St. Louis–San Francisco R. Co.*, 393 U.S. 324, 330, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969) (railway workers alleging racially discriminatory conduct need not exhaust contractual remedies—"[t]he circumstances of the present case call into play another of the most obvious exceptions to the exhaustion requirement—the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile."). Plaintiffs, in sum, need not have pursued plainly futile contractual remedies before filing their complaint.

**49.** Provision I language is used in CSXT's agreements with Yardmen represented by United Transportation Union; Trainmen (including Conductors in Canada) represented by United Transportation Union; International Brotherhood of Electrical Workers; Brotherhood of Lo-

Provision I neither requires nor mentions arbitration. To be sure, there is a strong national policy favoring labor arbitration.[51] But to favor arbitration is not to compel it. Were the Court to interpret Provision I to require arbitration, it would, in effect, create a contractual provision mandating arbitration where none exists. Such judicial activism is certainly not mandated by federal labor law.[52]

Provision II is divided into two relevant clauses. Clause one states, in pertinent part, that:

[a]ll claims or grievances involved in a decision by the highest designated officer shall be barred unless within 9 months from the date of said officer's decision proceedings are instituted by the employee or his duly-authorized representative before the appropriate division of the National Railroad Adjustment Board or a system, group or regional board of adjustment that has been agreed to by the parties hereto provided in Section 3 Second of the Railway Labor

comotive Engineers; and American Train Dispatchers Association.

**50.** Provision II language is used in CSXT's agreements with the Brotherhood of Maintenance Way Employees; International Association of Machinists; International Brotherhood of Firemen and Oilers; Brotherhood of Railway Carmen of the United States and Canada; Brotherhood of Railroad Signalmen; and Transportation Communication International Union.

**51.** This policy was established in a trio of Supreme Court decisions commonly referred to as the "Steelworkers Trilogy." *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Steelworkers Trilogy stands for the proposition that arbitration of collective bargaining disputes, if bargained for, is preferred over litigation.

**52.** *But see Rastall v. CSX Transportation*, C.A. No. 1414–88, slip op. at 4 n. 4 (D.C.Super.Ct. Jan. 11, 1989) (reviewed, *inter alia*, Provision I and concluded, without elaboration, that it mandated arbitration).

**1170**

Act.[53] ["first clause"].

Clause two provides that:

> [t]his Rule is not intended to deny the rights of the employees to use any other lawful action for the settlement of claims or grievances provided such action is instituted within 9 months of the date of the decision of the highest designated officer of the Carrier. ["second clause"].

The apparent conflict between these two clauses is easily reconciled. The first clause allows either employee or union to proceed to arbitration. The second clause, however, permits only employees to proceed before the courts. Unions are not permitted this second forum. If the second clause did not exist, CSXT or the unions could argue that court suits against either were barred by the dispute resolution provisions, notwithstanding that the law gives employees access to the courts under certain circumstances. Since the law does not require arbitration of the dispute at bar, the second clause allows employees to obtain recourse in any appropriate forum, including this Court.[54]

The Supreme Court has recognized that the strong federal policy in favor of arbitration "would not of course preclude ... [an employee's] court suit if the parties to the collective bargaining agreement expressly agreed that arbitration was not the exclusive remedy." *Republic Steel Corporation v. Maddox*, 379 U.S. 650, 657–58, 85 S.Ct. 614, 618–19, 13 L.Ed.2d 580 (1965). Here, the parties plainly did not agree that arbitration was the employees' exclusive remedy. To be sure, there is much to be said in favor of arbitration as the preferred means of resolving this dispute. But this, by itself, is not sufficient reason to compel the parties to arbitrate where they have not agreed to do so.

### 3. *Statute of Limitations*

CSXT argues that any applicable statute of limitations bars plaintiffs' suit.[55] According to CSXT, the statute of limitations ran from June 1983, the date retirement taxes were no longer collected for Canadian employees. CSXT is mistaken. The case at bar is predicated on plaintiffs' loss of eligibility for railway retirement benefits. Prior to the *RLEA II* decision, as CSXT once recognized,[56] the status of

---

**53.** The RLA gives the parties to individual collective bargaining agreements the power to establish special arbitration boards. Such boards are what are meant by "regional board[s] of adjustment." No such board was established here.

**54.** The Court in *Rastall* found that the second clause was "a contractual recognition of the employee's right under the Railway Labor Act to pursue a grievance in cases where his union declines to pursue it." *Rastall v. CSX Transportation,* C.A. No. 1414–88, slip op. at 4 (D.C.Super.Ct. Jan. 11, 1989). This interpretation is fatally flawed. The first clause already gives employees the right to pursue their own claims when the union declines to pursue them. Therefore, to interpret the second clause as the *Rastall* court suggests would be to make of it mere surplusage, contradicting basic rules of contract construction. *See* Restatement (Second) of Contracts § 203(a) (1981). Moreover, the second clause's language specifically reserves "the right of the employees to use any *other* lawful action for the settlement of claims or grievances ..." (emphasis added). Other lawful action here must refer to proceedings other than arbitration. The reservation of rights, then, is a reservation of the right to proceed with actions other than arbitration. In sum, *Rastall's* interpretation of the second clause is not persuasive.

**55.** CSXT does not identify which statute of limitations applies to the case at bar. Instead, CSXT argues that under any of three possible statutes of limitation, the RLA's, Canada's or the District of Columbia's, plaintiffs' suit is barred. The statute of limitations under the RLA is six months. *See DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed. 2d 476 (1983); *West v. Conrail,* 481 U.S. 35, 107 S.Ct. 1538, 1541 n. 2, 95 L.Ed.2d 32 (1987). Under the Canadian Code, a grievance alleging a breach of a collective bargaining agreement follows the time-frame agreed to in the collective agreement. *See Page–Hersey Tubes Ltd.* (1960), 11 L.A.C. 181 (Reville). The dispute resolution provisions here contain a sixty day period for filing claims and either a 9 month or 12 month period for filing appeals. The District of Columbia statute of limitations bars suits involving the interpretation of contracts brought more than three years after the action accrued. D.C. Code Ann. § 12–301(7) (1981).

**56.** CSXT's uncertainty is made clear in a March 1985 letter sent by a Chessie System attorney to a Canadian worker. In describing the *RLEA I* decision and the current status of Canadian workers' pension benefits, the attorney concluded:

> [i]n substance, the Court did not make a final decision whether Canadian employees should

plaintiffs retirement benefits was still uncertain. The *RLEA II* decision, therefore, was a necessary condition precedent to this law suit. The law does not require plaintiffs to file suit prematurely.[57] The D.C. Circuit entered its *RLEA II* decision on March 25, 1988. Until that date, therefore, no cause of action had accrued.

CSXT argues that the *RLEA II* litigation did not toll the statute of limitations because plaintiffs could have pursued their claims earlier in a parallel action. In support, CSXT cites *Belland v. Pension Benefit Guaranty Corp.*, 726 F.2d 839 (D.C. Cir.), *cert. denied*, 469 U.S. 880 (1984), and *Kolomick v. United Steelworkers of America*, 762 F.2d 354, 355–56 (4th Cir. 1985). Neither decision is apposite. In *Kolomick*, a worker filed a grievance against his union with the National Labor Relations Board ("NLRB"). When the NLRB refused to issue a complaint against the union, Kolomick sued his employer for wrongful discharge and the union for breaching its duty of fair representation. The court found that Kolomick's suit was time-barred. In *Kolomick*, however, resolution of the NLRB grievance would not have mooted his law suit. Plaintiffs' claims here, however, are premised on their exclusion from the System. If the *RLEA II* decision had been different, this dispute would be mooted. Put differently, in the

case at bar, the *RLEA II* litigation was not a parallel action; it was a necessary precondition for plaintiffs to file this suit. In *Belland*, former employees sued Georgia–Pacific and Brown Corporation to recover reduced pension benefits alleging breach of contract. The employees chose not to sue Georgia–Pacific and Brown until their request for retroactive coverage under ERISA was denied by the Pension Benefit Guaranty Corporation ("PBGC"). The *Belland* court found that the breach occurred when the pension benefits were reduced, and accordingly, the employees' suit was time-barred. In *Belland*, however, the request to PBGC was an attempt to obtain pension benefits from an alternative source, the federal government. The PBGC's determination was not a necessary precondition for plaintiffs filing suit. In the case at bar, as previously noted, the *RLEA II* decision was a necessary condition precedent for plaintiffs' to file suit.

This is a diversity suit for breach of contract. Federal courts in diversity apply the applicable state statute of limitations. The applicable statute of limitations is discovered by application of the forum state's (Virginia's) choice of law rules. *See Barry v. Donnelly*, 781 F.2d 1040, 1042 n. 3 (4th Cir.1986); *Crosson v. Conlee*, 745 F.2d 896, 902 (4th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985). Virginia's borrowing statute dictates that a

---

or should not have been held to lose eligibility [for pension benefits]. Accordingly, it appears that to commence a feasibility study for a retirement plan in lieu of railroad retirement benefits is premature without an indication of any further action taken by the Railroad Retirement Board on this matter. (Letter of John Tissue dated 11 March 1985).

**57.** Courts have often held that a cause of action accrues only after the resolution of a pending action that might have, but did not, restore the viability of the contract at issue. For example, in *Walker v. Continental Life and Accident Co.*, 445 F.2d 1072 (9th Cir.1971), the Ninth Circuit panel found that the statute of limitations did not begin to run until an adverse Supreme Court decision resolved a split among the circuits. Plaintiffs in *Walker* sought to rescind an annuity loan on the ground that the adverse Supreme Court decision frustrated its commercial purpose, namely gaining tax deductions. Defendant asserted that the cause of action arose when the IRS disallowed the claimed de-

ductions. The *Walker* court disagreed, noting that:

[t]o hold, as [defendant] urges us to do, that the cause of action arose when the [IRS] formally disallowed the claimed deductions ... would lead to the anomalous result that the contract was subject to rescission at a time when its major purpose, obtaining a tax deduction might still have been achieved. Had [the Supreme Court] decided differently [plaintiff] would not be here now.

*Walker*, 445 F.2d at 1075; *see also Hartford Life Ins. Co. v. Title Guarantee Co.*, 520 F.2d 1170 (D.C.Cir.1975) (cause of action on common law contractual theories did not arise until decision of D.C. Circuit invalidated underlying loan on which cause of action was based); *cf. Mt. Hood Stages, Inc. v. Greyhound Corp.*, 616 F.2d 394 (9th Cir.), *cert. denied*, 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980) (antitrust limitation period tolled during pendency of Interstate Commerce Commission proceeding because agency determination was prerequisite of antitrust liability).

foreign state's statute of limitations governs disputes if that state's law governs the contract. Va.Code § 8.01–247. Since District of Columbia contract law governs this dispute,[58] this court must apply the District of Columbia's three year statute of limitations. D.C.Code Ann. § 12–301(2). Plaintiffs filed suit on July 21, 1988, less than four months after the *RLEA II* decision issued. Since suit was filed well within the three-year limitations period,[59] plaintiffs claims are clearly not time-barred.

### B. Contract and Unjust Enrichment

 Plaintiffs claim that recovery is justified under either contract or unjust enrichment theories. CSXT responds that neither theory has any application to the case at bar. For the reasons stated hereafter, the Court concludes that summary judgment must be granted as to both theories. Plaintiffs' breach of contract claim fails because recovery due to impossibility of performance is not permitted where, as here, the event leading to the impossibility is foreseeable. The unjust enrichment theory also fails because it does not apply where, as here, there is an express contract.

### 1. The Contract Theory

 Plaintiffs contend that due to a change in Canadian law, CSXT is no longer able to make payments in the manner agreed to in the 1973 collective bargaining agreements. Therefore, under principles of impossibility, CSXT must provide plaintiffs with the benefit of their bargain through other means. Against plaintiffs' contract theory, CSXT's attack has three main thrusts. First, CSXT argues that any contractual rights created in 1973 have been extinguished by subsequent Congressional action and by the Board's determination that Canadian workers are excluded from the System. Second, CSXT contends that common law contract principles, crucial to plaintiffs' argument, have no application in the collective bargaining context. Third, CSXT asserts that recovery under common law principles of impossibility is inappropriate where the change in circumstances leading to the impossibility is foreseeable. This last argument is persuasive.[60]

 Legislation, in and of itself, does not supersede bargained-for contractual rights. It is sensibly settled that subsequent legislation supercedes or abrogates a contractual right only if it conflicts with it. *See Ry. Labor Executives Association v. Grand Trunk Western R.R. Co.*, 594 F.Supp. 758 (Sp.Ct.R.R.R.A.1984) (*"Grand Trunk"*) and *Boetjer v. Chesapeake &*

---

**58.** *See supra* note 36 and accompanying text.

**59.** This result obtains even though the dispute resolution provisions limit the filing of grievances to 60 days after the grievance occurred, May 24, 1988. In this case, plaintiffs requested relief from CSXT's chief counsel on April 12, 1988. This grievance was rejected. Since further resort to the administrative procedures would have been futile, *see supra* note 48, plaintiffs were not required to pursue them. Under the dispute resolution provisions, therefore, plaintiffs could file their complaint before any appropriate forum within the nine months mandated by Provision II or the one year mandated by Provision I. Plaintiffs claims were filed well within these periods.

**60.** At certain points in their papers, CSXT argues that plaintiffs, in effect, are asserting individual contractual or quasi-contractual rights in addition to any rights derived through the collective bargaining agreement. (Memorandum of Points and Authorities in Support of Motion For Summary Judgment 70–76). It is certainly true that such individual contracts would vio-

late well known principles of labor law. *See, e.g. Telegraphers v. Railway Express Agency*, 321 U.S. 342, 346, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944) (terms of subsequently made individual contracts may not supersede previously made collective bargaining agreement); *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338–39, 64 S.Ct. 576, 580–81, 88 L.Ed. 762 (1944) (individual contracts do not "survive or surmount collective ones. The practice and philosophy of collective bargaining looks with suspicion on such individual advantages."); *NLRB v. Allis Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *Belland v. Pension Benefit Guaranty Corp.*, 4 E.B.C. 1162, 1167 (D.D.C.), *aff'd*, 726 F.2d 839 (D.C.Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984) (individual quasi-contract remedies barred). If plaintiffs were asserting individual contractual or quasi-contractual rights, their claims would fail. This is not the case; instead, plaintiffs are asserting rights under the collective bargaining agreements.

*Ohio R. Co.*, 612 F.Supp. 1207 (Sp.Ct. R.R.R.A.1985). For example, a contract to pay an hourly rate equal to the minimum wage rate would be abrogated by legislation increasing the minimum wage rate, but not by legislation decreasing it. The latter legislative action would not conflict with the contract. That is precisely the situation in the case at bar. Neither the language nor the legislative history of the 1973 or 1974 amendments to the System are in any way in conflict with the bargain plaintiffs allege was struck. *Boetjer*, though not directly on point, reflects this general principle. There, the court noted that:

> Congress has the power to invalidate existing private contracts which interfere with its exercise of constitutional authority. Neither the plain [statutory language] nor its legislative history, however evidences any Congressional intent to [invalidate the contract in question].

*Boetjer*, 612 F.Supp. at 1210 (citations omitted). Under those circumstances, the *Boetjer* court concluded that the contractual rights there in issue were not abrogated.

*Grand Trunk* is more closely analogous. There, employees of a private carrier asserted collective bargaining agreement claims based on a federal statute governing displacement, separation and termination allowances. The issue was whether congressional repeal of the statute amounted to a "congressional abrogation of those private contract rights set forth in [the statute] and incorporated by reference in the contracts between the parties to this suit." *Grand Trunk*, 594 F.Supp. at 760. The court concluded that the private contractual rights were not abrogated, since "no new protections were enacted for the employees of the private carriers, there is no statutory provision with which the private contracts could be found to be inconsistent." *Id.* at 761. The court contrasted these employees with the employees of a public carrier, Conrail, in *Ry. Labor Executives' Association v. United States*, 575 F.Supp. 1554 (Regional Rail

Reorg.Ct.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984). Conrail workers had claimed, under the collective bargaining agreement, private rights based on the same statutory scheme as that involved in *Grand Trunk*. Congress, however, had provided Conrail employees with new statutory benefits that were inconsistent with the former statutory benefits. Thus, that court correctly concluded that any contractual rights the Conrail employees enjoyed under their collective bargaining agreements had been abrogated. By contrast, the workers in *Grand Trunk* were not covered by the new statutory scheme, and hence Congress had not abrogated their contractual rights.

In the instant case, the legislative history does not suggest that Congress intended to supersede or abrogate collective bargaining rights plaintiffs claim here. On the contrary, this history demonstrates that Congress intended only to enact the legislative portions of the agreement negotiated between management and the unions. Indeed, Congress viewed the System as essentially a private labor pension fund. "[T]he Railroad retirement system is today, in essence, a company pension program administered, for historical reasons, by the Federal government.... Future changes in [plan benefits] will arise out of collective bargaining between the railroads and the unions." S.Rep. No. 1163, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5702, 5714. Nowhere did Congress suggest any intent to supersede or abrogate private contractual rights created in collective bargaining. Indeed, not until Tier II tax rates increased in 1981 was there any congressional activity which is arguably inconsistent with the parties' agreement.[61] Similarly, the Board's subsequent determination that plaintiffs were no longer entitled to benefits did not reflect a determination to abrogate any contractual benefits which ran concurrently with, or in addition to, the Board-managed retirement plan.

**61.** Given the Court's resolution of this matter, it is not necessary to reach here the question

whether the 1981 changes in Tier II tax rates operate to supersede plaintiffs' claimed rights.

For its second major attack on plaintiffs' contract theory, CSXT argues that common law contract principles have no application where, as here, they are used to interpret collective bargaining agreements. CSXT, however, is mistaken. Common law contract principles are rejected whenever labor law principles conflict with or supersede them.[62] However, when not in conflict with or superceded by labor law principles, common law contract principles are often used to interpret collective bargaining agreements.[63] Nor should this be at all surprising. Collective bargaining agreements are simply highly specialized contracts. When interpreting other highly specialized contracts (insurance contracts, licensing agreements and the like) courts apply basic contract law principles to the extent they do not conflict with statutory, administrative or judicially mandated rules or the underlying purposes of the regulation.[64] CSXT has not identified any labor law rule prohibiting the application of the common law principle requiring restitution where an unforeseen impossibility occurs. None exists. Nor is there any reason in principle why this common law contract theory should not apply here.

For its third attack on the plaintiffs' breach of contract theory, CSXT asserts that recovery is barred because the putative impossibility was not unforeseeable. It argues that the Board's 1983 ruling was reasonably foreseeable because the foreign exclusion provision has been part of the Act since 1940. Put differently, the foreign employee exclusion put plaintiffs' unions on notice of the risk that Canadian employees might subsequently by excluded from the system. They assumed this risk. Therefore, CSXT argues, recovery under common law impossibility principles is inappropriate. This argument is persuasive.

The contract theory of impossibility (impracticability) and restitution is set forth in the Restatement:

> Where, after a contract is made, a party's performance is made impracticable

**62.** *See, e.g. Transportation–Communication Employees Union v. Union Pacific R.R.,* 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966); *Hendricks v. Airline Pilots Ass'n,* 696 F.2d 673 (9th Cir.1983); *Belland v. Pension Benefit Guaranty Corp.,* 4 E.B.C. 1162, 1167 (D.D.C.1983), *aff'd on other grounds,* 726 F.2d 839 (D.C.Cir.), *cert denied,* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984). *Peterson v. Air Line Pilots' Ass'n,* 759 F.2d 1161, 1170 (4th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985) (actions for conspiracy and interference with contractual relations preempted by duty of fair representation under RLA).

**63.** *See, e.g. United Food and Commercial Workers Local No. 222 v. Iowa Beef Processors, Inc.,* 683 F.2d 283 (8th Cir.), *cert. denied,* 459 U.S. 1088, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) (affirming arbitrator's use of common law contract principles in interpreting a collective bargaining agreement); *Arizona Laborers v. Conquer Cartage Co.,* 753 F.2d 1512, 1517 (9th Cir.1985) (applying contractual principles of looking to intent of parties in interpreting collective bargaining agreement); *Roadway Express, Inc. v. General Teamsters, Chauffeurs & Helpers Union, Local 249,* 330 F.2d 859, 864 (3d Cir.1964) (applying common law principles of contract formation to collective bargaining agreement under Railway Labor Act). As the *Roadway Express* case indicates, there is no reasonable explanation for refusing to apply contract principles to contracts under the Railway Labor Act if the circumstances so warrant.

**64.** CSXT cites *Transportation–Communication Employee's Union v. Union Pacific R. Co.,* 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966) and *Hendricks v. Airline Pilots Assn,* 696 F.2d 673 (9th Cir.1983) in support of their position. Neither decision is apposite. In both, application of common law contract principles conflicted with the underlying purposes of collective bargaining, encouraging collective agreements and promoting labor peace. In *Transportation–Communication,* application of common law contract principles had allowed the Railroad Adjustment Board to avoid solving a jurisdictional dispute between two unions. The Supreme Court held that the Adjustment Board should have considered the scope of other collective agreements as well as common labor practices, rather than common law contract principles, and resolved the jurisdictional dispute. In *Hendricks,* airline pilots asserted that application of common law contract principles in interpreting their collective bargaining agreement allowed them to enter into individual contracts with their employer. The *Hendricks* court held that application of these contract principles would conflict with the strong labor policy opposing individual contracts. The court, therefore, refused to apply them. In this dispute, on the other hand, application of common law contract principles does not conflict with the underlying purposes of collective bargaining. Under these circumstances, application of those principles is appropriate.

... by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render performance is discharged ...

*Restatement (Second) Contracts* § 261 (1979). If performance is rendered impossible, parties who previously performed under the contract are "entitled to restitution for any benefit that [they have] conferred on the other party by way of part performance or reliance." *Id.* at § 377; *see also* 18 S. Williston & W. Jaeger, *Williston on Contracts* § 1974 (3d ed. 1961). Plaintiffs contend this theory entitles them to recover the retirement tax contributions CSXT made on their behalf and subsequently recovered from the Treasury Department. They rely on *New York Central & Hudson River R. Co. v. Gray*, 239 U.S. 583, 36 S.Ct. 176, 60 L.Ed. 451 (1916). There, Gray performed services for the railroad in return for fare passes valued at $600. Congress subsequently prohibited railroads from honoring fare passes. At the time, Gray had used only a portion of the $600 in passes. Since he had fully performed his party of the bargain, he sued the railroad for payment of the unpaid balance of his services. The Supreme Court found that:

> the railroad company acted strictly in accordance with the law when it refused any longer to furnish transportation to defendant.... But from this it by no means follows that it could refuse to make just compensation in money for the unpaid balance [for the services performed]. The judgment of the state court proceeded upon the ground that since the contract had been fully performed by Gray, so that the railroad company had received the entire benefit of it, and since the delivery of the particular consideration stipulated for it had been prohibited by act of Congress, the company thereupon ·became bound upon general principles of justice to pay him an equivalent in money for the balance of the consideration. In so holding the court was simply administering the applicable principles of state law, and did not run counter to the act of Congress.

*Id.* at 586–87, 36 S.Ct. at 177; *see also M.A. Felman Co. v. WJOL, Inc.*, 104 Ill.App.2d 66, 243 N.E.2d 33 (1968) (same basis for recovery).

■■■ Gray is distinguishable. The event that rendered impossible further performance by the New York Central was plainly unforeseeable. Contracting parties are not required to foresee changes in the governing law. In *Felman*, too, the change in law was unforeseeable. Here, however, the governing law, *i.e.*, the Act, did not change. Instead, the Act warned the parties that existing circumstances in Canada could change and result in the exclusion of Canadian employees from the System. In other words, what changed was not a law on which the contract was based at the time of making, but rather a fact or circumstance on which the parties relied, although they had every reason to doubt its immutability.

It has long been settled that contracts are made with currently applicable laws in mind. For example, in *Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall) 535, 18 L.Ed. 403 (1866), Justice Swayne noted that:

> [i]t is ... settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement.

*see also Denice v. Spotswood I. Quinby, Inc.*, 248 Md. 428, 237 A.2d 4 (1968); *Shell Oil Co. v. Ryckman*, 43 Md.App. 1, 403 A.2d 379 (1979). *See generally* 4 S. Williston & W. Jaeger, *Williston on Contracts* § 615 (3d ed. 1961). It follows, then, that the foreign exclusion provision, extant since 1940, formed a part of the parties' contract. Therefore, as a matter of law, plaintiffs' unions were on notice of the foreign exclusion during the 1973 negotiations. This same foreign exclusion, when triggered by changes in Canadian law, led to plaintiffs' exclusion from the System.

The law is clear that the impossibility theory is inapplicable where the party has reason to know of facts which might cause impossibility. Put differently, to be protected by rules governing existing impracticability, "the affected party must have had no reason to know at the time the contract was made of the facts on which he later relies." *Restatement (Second) of Contracts* § 266(1) comment a (1979). This general principle was applied in *In re Zellmer's Estate,* 1 Wis.2d 46, 82 N.W.2d 891 (1957). There, a father had promised his daughter $5,000 in benefits from a previously lapsed life insurance policy. The daughter subsequently sued his estate for recovery of $5,000. The estate claimed that the contract for $5,000 was unenforceable due to the impossibility of performance existing at the time of its making. The *Zellmer's* court rejected the estate's argument and found that:

> [a] promisor should not be excused from responding in damages for breach of contract on the ground of impossibility of performance due to mistake in a situation, where due to his own negligence, he had failed to discover at the time of entering into the contract the nonexistence of the fact or thing which made performance by him impossible.

*Id.* 82 N.W.2d at 894. Here, plaintiffs' unions were on notice of the foreign exclusion when the 1973 Memorandum of Understanding was signed. They had reason to know at the time the contract was made of the facts and circumstances which could exclude foreign employees from the System. Plaintiffs cannot now rely on these same facts and circumstances for recovery of benefits.

Plaintiffs assert that, in fact, the change in Canadian law was the event triggering impossibility of performance. This assertion begs the central question: was the *effect* of the change in Canadian law reasonably foreseeable at the time the contract was made? *See Restatement (Second) Contracts* § 264 comment a (foreseeability requirement incorporated into standard for impossibility due to change in regulation). It was. Plaintiffs should have known and anticipated that if certain circumstances changed in Canada, whether by law or regulation, the foreign exclusion provision would operate to exclude Canadian railroad workers from participation in the System. Once put on notice of this, plaintiffs' unions could have provided contractually for this contingency. They did not. Plaintiffs cannot now rely on whatever errors their negotiators made in 1973 to obtain recovery against CSXT in 1989.

Count I, therefore, must be dismissed.

### 2. *The Unjust Enrichment Theory*

█ Plaintiffs unjust enrichment theory must be rejected because a necessary condition precedent is absent: there must be no actual, express contract. Unjust enrichment claims can arise only where, unlike here, there is no express contract, whether written, oral or both. For example, in a suit for compensation under an employment contract, an Eighth Circuit panel noted that:

> there can be no recovery in quantum meruit where a valid express contract between the parties exists. Parties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms. [The employee's] claim is based upon the employment contract and we have remanded for a determination whether the express provisions bar or do not bar his contractual claim. We thus reject [the employee's] claim for recovery in quantum meruit.

*In re Stevenson Assoc.,* 777 F.2d 415, 421–22 (8th Cir.1985). The same result obtained in *Benefit Trust Life Ins. Co. v. Union Nat'l Bank,* 776 F.2d 1174, 1177 (3d Cir.1985). In *Benefit Trust,* plaintiffs sued an insurance company for prejudgment interest. The Court noted that " 'the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between parties is founded on a written agreement or express contract.' " *Id.* at 1177 [quoting from *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 290, 259 A.2d 443, 448 (1969) ]; *see also Restatement Restitution* § 107(1) (1937). This well-settled legal principle disposes of plaintiffs' unjust enrichment claims. In the case at bar, plain-

tiffs rely on an express contract: the 1973 Memorandum of Understanding and the other documents which make up the collective bargaining agreement. Thus, plaintiffs cannot rely on an unjust enrichment theory of recovery.

Plaintiffs cite three cases in support of their unjust enrichment theory. None are apposite. In neither *Teamsters Local No. 310 v. Ingrum (In re Tuscon Yellow Cab Co., Inc.)*, 789 F.2d 701 (9th Cir.1986), nor *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984), were express contracts in effect. *Local 50, Bakery and Confectionery Workers Union v. Local 3, Bakery and Confectionery Workers Union*, 733 F.2d 229, 233, 236 (2d Cir.1984), is even less pertinent. That case involved a dispute between two union locals over the control of employee insurance benefits. There, too, no contract existed.

Count II, therefore, must be dismissed.

### V. *Conclusion*

Distilled to its essence, this complex matter is a wage dispute. It arose because the parties failed to heed the Act's warning that foreign workers might be excluded from the System under certain circumstances. Hence, they failed to provide for this contingency in their collective bargaining agreements. When it occurred, plaintiffs claimed surprise. While plaintiffs' surprise is understandable, it is not unfair surprise. The Act's foreign service exclusion was a blinking beacon of caution; it warned of the exclusion risk. Having failed to make provisions for this in their agreements, plaintiffs have no contract remedy. They may, however, have a remedy of sorts in the currently ongoing collective bargaining concerning the possible establishment of a private pension plan for these Canadian employees now excluded from the System. Throughout this proceeding, plaintiffs have claimed that CSXT was unjustly enriched because it received plaintiffs' labor for less than it bargained for when it retained the refunded retirement taxes paid on plaintiffs' behalf. But for the express agreement, this unjust enrichment claim might have been valid. To

the extent that plaintiffs' argument still has force, it may find some vindication in the current negotiations on a new pension plan.

An appropriate order has been entered.